1816.

MATTER OF
BARKER.

## In the matter of JAMES BARKER.

Where a person, from *old age*, sickness, or other cause, becomes so weak and incapacitated in mind as to be unable to manage his affairs, a commission, in nature of a writ *de lunatico inquirendo*, may be awarded; and where the inquisition of such a writ found the party, who was 85 years old, to be of " unsound mind, and mentally incapable of managing his affairs," a committee of his estate was appointed.

A PETITION of *John Barker*, and *Mary Dederick*, was *November* 12th. presented, stating, that they are the children of *James Barker;* that he now is, and had been, for four months past, so far deprived of reason and understanding, as to be wholly unfit and unable to manage his affairs; and praying that a commission, in nature of a writ *de lunatico inquirendo*, might issue, &c.

*The affidavits annexed to the petition stated, that the      [ * 233 ] petitioners were the only surviving children of *J. B.*, who was 85 years old; that he was seised of a large real estate, of great value, which was going to ruin and waste, &c. Many acts of *J. B.* were also stated, showing the imbecility of his mind, and his want of the understanding requisite for the management of his property.

*J. V. D. Scott*, in support of the petition, cited *Ridgeway* v. *Darwin*, 8 *Ves. Rep.* 65.

THE CHANCELLOR. It is evident that *Barker*, the subject of this application, is not a lunatic, within the legal meaning of the term. He is not a person who sometimes has understanding and sometimes not. He is rather of that class of persons described by Lord *Coke*, (*Co. Litt.* 246. b.) as *non compos mentis*, who have lost the memory and understanding by sickness, grief, or other accident. The suggestion here is, that his mind is worn out by old age, so as to render him incapable of managing his property. It is represented that he has arrived to a state of second childhood, and stands in absolute need of the protection of the Court against his own acts, and against the practices of evil and designing men. The case, as stated, appears to be deeply interesting to humanity, and to present a strong appeal to the powers and justice of this Court. The difficulty which has arisen with me, is as to the extent of my jurisdiction. Mere imbecility of mind, not amounting to idiocy or lunacy, has not, until very lately, been considered in the *English* Court of Chancery, as sufficient to interfere with the liberty of the

subject over his person and property. I have not met with a case prior to our revolution which has gone so far. Lord *Hardwicke* disclaimed any jurisdiction over the case of mere weakness of mind ; yet it is certain that when a person becomes mentally disabled, from whatever cause the disability may \*arise, whether from sickness, vice, casualty, or old age, he is equally a fit and necessary object of guardianship and protection. The Court of Chancery is the constitutional and appropriate tribunal to take care of those who are incompetent to take care of themselves. There would be a deplorable failure of justice, without such a power. The object is protection to the helpless ; and the imbecility of extreme old age, when the powers of memory and judgment have become extinct, seems, as much as the helplessness of infancy, to be within the reason and necessity of the trust. I am aware, however, that the inquiry must, in many cases, be peculiarly delicate, because it concerns the character of the party, and his natural rights, and because of the difficulty there is in ascertaining the extent of the decay of the mind, necessary to form a proper case for the interference of the Court.

Under this impression of the subject, I have followed carefully the progress of the decisions, with a view to discover, as far as I was able, my authority and duty in the case.

In the time of Lord *Hardwicke*, it was understood that there was no specific relief for the case of incapacity from mere weakness of mind. This appears from the case *ex parte Barnsley*, in 1784, (3 *Atk.* 168. 3 *Eq. Cas. Abr.* 580.) in which, on a commission to inquire whether *Barnsley* was a lunatic, the inquisition found that, from weakness of mind, he was incapable of governing himself or his estate ; and the inquisition was quashed for insufficiency. The case was elaborately argued, and precedents searched, and Lord *Hardwicke* said, the finding must be that he was a lunatic, or, what was correspondent with that word, that he was of an unsound mind. It was not sufficient that he was weak and worn out with age, and incapable of managing his estate. He admitted that the law was possibly too strict, and that it might be useful that a *curator* or *tutor* should be set over prodigal and weak persons, as in the civil law. Lunacy was a technical term, and the \*Court could not depart from the legal definition, and, therefore, weakness of mind was not a sufficient reason for granting the custody of the person and estate ; as, in that case, people of violent passions, drunkards, and careless and silly people, would be subject to a commission. Their acts might, in certain cases, be set aside on the ground

186

of imposition upon weakness; but commissions of lunacy were not intended for such people.

The same doctrine was afterwards held by Lord *Hardwicke*, in Lord *Donegal's* case, (2 *Vesey*, 407.) and this appears to have been the declared sense and practice of the Court of Chancery in *England*, down to the period of our revolution. But that Court has since proceeded upon more liberal, and, as I think, more correct and just reasoning; not, indeed, that they have introduced new principles of equity, but have rather made a more extensive and sound application of powers and principles already existing. If the Court, as Lord *Hardwicke* admits, will relieve against the acts of persons incompetent to manage their affairs from weakness and age, it is surely more wise to anticipate the case, and prevent the necessity of a subsequent interference. There are cases as ancient as the time of Lord *Talbot*, and Lord Keeper *Wright*, (*Leving* v. *Caverly, Prec. in Ch.* 229. *Anon.* 3 *P. Wms.* 111. note,) in which the Court has protected the weakness of very superannuated persons, whose minds had nearly perished, by admitting them, on due proof, by affidavit or otherwise, of such imbecility, to appear and answer by guardian; and this course is still pursued in such cases. (14 *Vesey*, 172.)

The first intimation I have met with of a departure from the strict technical rules under which Lord *Hardwicke* held these commissions, is in 6 *Vesey*, 273., where Lord *Eldon* says, that evidence may support a commission not of lunacy, but *in the nature of* a writ *de lunatico inquirendo*, in which, he says, it must be remembered, that it is not necessary *to establish lunacy; but it is sufficient that the party is incapable of managing his own affairs.

This question arising on this enlarged jurisdiction of the Court, afterwards underwent a full discussion, by Lord *Eldon*, in *Ridgway* v. *Darwin*. (8 *Vesey*, 65.) He observed, that in Lord *Hardwicke's* time, commissions of lunacy were not granted to the extent in which they have been since granted. That when he came into the Court, he found a course of cases establishing its authority where the party was not absolutely insane, but was unable to act with any proper and provident management, and was liable to be robbed by any one, under that imbecility of mind, calling for as much protection as absolute insanity. When the mind was worn out by years, or epilepsy, or habitual intoxication, &c., the party required that care should be thrown around him; and he held him to be a proper subject of a commission in the nature of a writ of lunacy; and, until the legislature should take measures to preserve persons in a state of imbecility exposing

[ * 236 ]

1816.

MATTER OF
BARKER.

them to as much mischief as insanity, or these decisions should be reviewed, he should not undertake to alter them. The case before him was that of imbecility of mind in a lady, proceeding from epileptic fits, and he directed two physicians to visit her, and determine whether her mind was competent; and an order was eventually made, restraining her from' executing any instrument, except under the limitations prescribed in the rule.

The same point, afterwards, came before Lord *Erskine*, in the case *ex parte Cranmer*. (12 *Vesey*, 445.) The return to the commission was, that the party was so far debilitated in his mind as not to be *equal* to the general management of his affairs; this was considered as too ambiguous, and the inquisition was quashed, and a *melius inquirendum*, or new inquiry, was directed. But the chancellor did not admit any defect of his jurisdiction, though he thought the power assumed was of immense moment, and *pressed on the liberty of the subject. If the mind, as he observed, be disorganized by sickness, grief, or old age, who could say he had not jurisdiction, and why should not a man be protected in his second state of infancy as well as in the first? He felt, as Lord *Eldon* appears strongly to have felt, that persons who are, above all others, entitled to protection, should not go unprotected; and he considered that they came within that class of cases mentioned by Lord *Coke*, of persons *non compos*, if their understandings had become destroyed, by surviving the period that Providence has assigned to the stability of the mind.

The question, as Lord *Erskine* observed, was, whether the party had become mentally incapable of managing his affairs.

I am satisfied that these later decisions are not only founded in good sense, and the necessity of the case, but are a sound exposition of the common law, which gave to the king, as *parens patriæ*, the care and custody of all persons who had lost their intellects, and become *non compos*, or incompetent to take care of themselves. (*Beverley's* case, 4 *Co.* 127, 128. 1 *Blacks. Com.* 304.) All the cases agree that the statute of 17 *Ed.* II., committing to the king the care of the persons and estates of idiots and lunatics, was not introductory of a new right, but only went to regulate a right preexisting in the crown. (4 *Co.* 126. *Amb.* 707. 2 *Vesey, jun.* 71. 75.) I should feel that I had but very imperfectly discharged my trust, if I was the means of crippling the jurisdiction of this Court, by confining it to the strict common law writ of lunacy. A numerous class of persons, whose minds have sunk under the power of disease, or the weight

[ *237 ]

of age, would, in that case, be left without protection, and liable to become the victims of folly or fraud. This would be a blemish in the jurisprudence of the country.

I shall, therefore, award a commission, in the nature of a writ of lunacy, to inquire whether *James Barker* be *of unsound mind, or mentally incapable of managing his affairs ; and I shall direct that he be present, for it is his privilege, so that the jury may have inspection of him.

1816.

MATTER OF BARKER.

[ * 238 ]

Order accordingly.

N. B. The inquisition was taken and returned, finding that *James Barker* was, and, for one year preceding, had been, " of unsound mind, and mentally incapable of managing his affairs ;" and, further, that he owned 5,000 acres of land, of the value of above 75,000 dollars ; and that he had a son and daughter living, each upwards of 50 years of age, and a great number of grandchildren.

A committee of his estate was appointed.