## DENNETT v. DENNETT.

On a petition for a rehearing in chancery, on the ground of newly discovered evidence tending to show the incapacity of a grantor to execute a deed, it is not enough to show new evidence of medical experts, tending to show that the grantor's health had been much impaired for several years by apoplectic or other fits; that he was probably affected by disease of the brain, which is usually accompanied by an impaired state of the mind, and that the evidence showed such impared state of the mind.

Mere weakness of mind does not disable a man to convey property, if the capacity remains to see things in their true relations and to form correct conclusions. If the mind is so impaired that the memory can not recall the necessary facts, nor the judgment be exercised in drawing just conclusions, the power of disposing of property is gone. The evidence must show the degree in which the mind is impaired to be inconsistent with the rational transaction of business.

All that the law requires to make a deed effectual is, that a man should have possession of his reason so as to understand the effect of the act he is about to perform, where there is no insane delusion.

THIS is a petition for a rehearing. The petition of Joseph F. Dennett sets forth that on the 18th of March, 1862, William H. Dennett filed his bill in equity against said Joseph, upon which evidence was taken and a hearing had, and an opinion delivered in favor of said William; but no decree was entered, and the case is still pending. Since the hearing the petitioner has discovered new evidence as to the mental capacity of Mark Dennett, mentioned in said bill, at the time of the execution and delivery by him of the deed mentioned in said bill to said William, the 19th of November, 1852, sufficient, as he believes, to satisfy the court that said Mark Dennett was not then of sufficient mental capacity to comprehend and intelligently execute said deed, which evidence was not then known to the petitioner, though he used all reasonable diligence to procure evidence in his favor upon the question of said Mark's capacity. He prays for a rehearing, and an injunction against a suit at law, &c.

The petition and order of notice were served on the petitionee May 19, 1863.

Upon the hearing on the original bill it was held that Mark Dennett was capable of making a deed, and the rehearing is sought upon this point only.

The affidavits in support of the petition were made by Susan F. Dennett, widow of Mark; Susan D. Fabyan, a niece; Joseph F. Dennett, the petitioner; Benjamin W. Curtis and William Laighton, physicians at Portsmouth, and Jesse P. Bancroft, superintendent of the Asylum for the Insane at Concord. To these were added affidavits of John Fabyan, a brother-in-law; John P. Dennett, a brother; Olive M. Caswell, and Ann S. Huntress, daughters, and Benjamin Hodgdon, whose depositions were before the court at the hearing, but whose affidavits contain some new facts in support of their opinions.

On the other side are the affidavits of William H. Dennett, the petitionee, and of Nathan W. Oliver and George Odell, physicians in Portsmouth and North-Hampton.

The deposition of Dr. Bancroft contains an analysis of the facts

stated by the other witnesses of the petitioner, and they are there-fore not recited. The opinions of the other medical witnesses may be regarded as neutralizing each other. Dr. Bancroft testifies that he has been a physician nineteen years, superintendent of the N. H. Asylum five years, and has devoted his attention to those diseases which are associated with disorders of the mind. He says, "I have carefully examined the depositions of Benjamin Hodgdon, Susan D. Fabyan, Olive M. Caswell, Ann S. Huntress, Susan F. Dennett, John P. Dennett, Joseph F. Dennett, John D. Fabyan, and Drs. Wm. Laighton and Benjamin W. Curtis,— all having reference to the bodily health and mental condition of Mark Dennett, deceased. The significant facts, as gathered from the depositions, are as follows :

For many years before his death, Mark Dennett was subject to attacks, at intervals, which the deponents call fits. In these seizures there were muscular spasms, as shown in the statement of Susan F. Dennett, that "he was taken with trembling in his hands and arms," &c. These spasms were unequal on the two sides of the body, as shown by the testimony of J. F. Dennett, that "his face was drawn to one side," and the power of articulation lost. J. F. Dennett also states that insensibility accompanied these attacks, and the return of consciousness was very gradual, as also the use of the muscles. Susan F. and Joseph F. both testify that there was permanent loss of sensibility of one hand and leg, and that the leg in which the sensibility was lost was permanently reduced to two thirds its natural size. Susan F. Dennett states that he lost the control of the will over the muscles, in the remark that after the attack fifteen years before his death, he was never able to dress or undress himself. Others also testify to the permanent derangement of the powers of speech. During these attacks there was much derangement of the mental operations, as shown in the statement of Joseph F. Dennett, that "whenever he became able to say any thing it was of an out of the way character"; and of Olive M. Caswell, that "before and after the fits he was entirely out of his head." Benjamin Hodgdon also states, that on calling at one time, the day after one of these fits, "his son, William H., told him his father was not able to take care of himself, being very much out of his head." These symptoms, in common and sometimes rather vague terms, are sufficiently marked to characterize the existence of quite a com-mon occurrence — an organic disease of the brain — probably of one hemisphere. They show that the disease was developed gradually, but progressed steadily from the first till his death. This supposi-tion is necessary to account for the permanent paralysis of sensation and motion in one side of the body, and the permanent withering of the leg to two thirds of its natural size. These last symptoms distinguish the case from one of ordinary epilepsy. The insensibil-ity during and for a time after the fits is common to both.

Without discussing the question of the classification of this case among diseases, I am satisfied that the essential condition on which the phenomena depended was an organic or structural disease of the brain, which was continuous and progressive from the first seiz-ure, and ended in death.

It remains now to inquire what may be the relation of such a disease of the brain to the mental condition of the individual in whom it occurs. The phenomena enumerated above will not, in the absence of all other facts, demonstrate the necessity of accompanying mental impairment to an equal degree with the body; because very rare instances do occur in which this group of symptoms is seen, while the subject retains, in a considerable degree, the use of the mental faculties, until the fatal issue of the disease in the physical system. But such cases are rare exceptions to the general course, and indeed it would be difficult to find a case in which there did not occur some mental impairment.

The existence of these symptoms alone will therefore create the strongest probability, *a priori*, that the mental powers in any given case would follow the general course, and break down in common with the physical system.

With this very strong probability existing in the nature of the case in any given instance, even a moderate number of particular facts in proof directly of mental impairment, corresponding to that of the body, would seem competent to establish its existence. The facts bearing directly on this point, and showing that the case of Mark Dennett was not an exception, but that the mental impairment usually seen in such cases did exist in his, are the following: Widow Susan F. Dennett says: "After he began to have fits he did not appear as he used to previously, but was childish." Dr. Curtis says: "His faculties were exceedingly feeble. He could not, at any time that I saw him, give any account of his feelings, or information as to his case." Olive M. Caswell says: "For many years previous to his death he was wandering, childish and unreasonable." Benjamin Hodgdon says: "His farm was managed badly for a number of years, and so was his other business." John Fabyan says: "Before his attack he was enterprising and prosperous, but afterward his afflictions seemed to destroy all his mental energy, and render him incapable of managing his business affairs prudently. He sold wood and timber for less than it was worth, and permitted many to go into his wood-lot and cut and haul out without his knowing what or how much. In one instance he sold a very large lot of white oak timber for $7 per ton, when it was worth $12 or $14 per ton." Joseph F. Dennett says: "After he began to have fits he was childish and forgetful, showing himself as much pleased with a stick of candy or a piece of cake as a child would have been. I have heard him talk very wild on religious subjects, saying that he was the most perfect man since Christ. I have often heard him talk with others childishly about his affairs, and cry like a child. He suffered people to go upon his wood-lot, year after year, and cut as they pleased without looking after them."

These constitute the only points in the depositions bearing directly on the mental state of Mark Dennett, after the invasion of the brain disease. Although the facts are less numerous than could have been desired for *easily* forming an opinion, still they afford very great and important evidence of his enfeebled mental powers, as shown under a considerable variety of circumstances, and applied

to a variety of subjects, and thus do much to corroborate the conclusions to which each of them separately is calculated to lead, namely, that from the invasion of the brain disease the mind began to deteriorate as a result of that disease, and continued to do so as it progressed to the fatal termination.

Before the attack he was characterized by enterprise and good management in business. After this it appears that he made particular trades which were wholly inconsistent with his former character for prudence and shrewdness, and his transactions generally were disastrous. This can not well be accounted for in a man who, for the first years of his business life, had been enterprising and prosperous, except on the supposition that from some cause his mental faculties had sustained serious damage. And it is hardly conceivable that a man possessing the good sense that Mark Dennett is represented to have exercised in the early part of his life, should, for a long series of years previous to his death, have been habitually pleased with trifles, or have given utterance to the comparison of himself with Christ in perfection, on any other supposition than that of mental disease, which had destroyed the healthy operation of his faculties.

Therefore, taking the statements of the different deponents as facts, I see no philosophical explanation of them except on the supposition above named, that bodily and mental disease were associated in the case, and that the latter was dependent on the former and the legitimate consequence of it. I am therefore brought to the conclusion that (since the facts bearing directly on his mental state can not be properly explained without the supposition of great deterioration of the mental faculties, and since a brain disease coexisted, which is not only capable of producing such disorder of the mind, but is with great uniformity followed by loss of mental integrity) such was the result in the case of Mark Dennett, and that the same was in a state of *dementia* during the latter years of his life, produced by the disease of the brain, referred to in the first part of this deposition."

Joseph F. Dennett in his affidavit says : "During the pendency of the bill in equity of William H. Dennett against me, and before the hearing thereon, I made every exertion to procure testimony bearing on the competency of Mark Dennett to do business ; that I could not learn that any physician knew any thing about his state, excepting Dr. Cheever, who has long been dead ; that shortly after the hearing I learned that Dr. Laighton had seen and known him ; and that I took his testimony as soon as I could. Prior to said hearing I questioned Mrs. Susan F. Dennett, widow of said Mark, and she refused to say any thing, except that she knew he did not know what he was about, because he executed the deed without informing her of it. I did not then understand that the withering of his leg and side was a matter bearing on the question. I never knew of Dr. Curtis' knowing any thing of my father's state until the last of February or first of March, and I took his testimony as soon as I could procure it. Until I had the above testimony I did not suppose that I had sufficient facts on which to procure the opinion of an expert,

and I procured the affidavit of Dr. Bancroft as soon as I could after I had testimony sufficient to submit to him. I did not know what Susan D. Fabyan would testify until after said hearing."

*W. H. Rollins*, for the petitioner.

*A. H. Hoyt*, for the petitionee.

BELL, C. J.   Where new facts or new evidence have been discovered after the hearing, which might probably change the decision, and before the final decree is entered, the case may be reheard upon petition, and the decree reversed, modified or corrected.   The petition should set forth the case, and the proceedings in it; the new facts or evidence, and when discovered; and that it was unknown at the hearing, and could not have been known by the exercise of reasonable diligence.   Notice of the application must be duly given to the adverse party; and it must be fully supported by affidavits, which may be met by counter affidavits.   3 Dan. Ch. Pr. 1615, 1722; Story Eq. Pl., sec. 421.

In England, it is enough to show that the facts or evidence were unknown at the time of publication.   Here, from the difference of our practice, it must be shown that they were unknown at the hearing, since, upon application, leave would be granted to take further evidence till the hearing, in any case where the want of the evidence would justify a rehearing.

In cases of application for a new trial at law, a new trial will not be granted, where the party or his counsel knew, or ought to have known, the existence of the evidence before the trial was closed. Negligence is reckoned equivalent to knowledge.   The party will be taken to have known what, by the exercise of proper diligence, he ought to have known.   And the same rule is held on applications for a rehearing in equity.   3 Dan. Ch. Pr. 1733, 1734; Story Eq. Pl., secs. 413, 414.

A rehearing will not be granted on account of the discovery of new evidence upon new matter, nor because the importance of the testimony has only been discovered since the decision, if the party had it in his power to ascertain its importance before the hearing, and has neglected to do so, and to obtain the testimony; nor where the newly discovered evidence is merely cumulative upon the litigated facts already in issue; nor for the purpose of contradicting or discrediting a witness examined by the adverse party; nor on account of any error of judgment or mistake of law by counsel. 3 Dan. Ch. Pr. 1623, &c.; Story Eq. Pl., secs. 413, 414.

We have not deemed it necessary to consider whether any of these principles would stand in the way of a rehearing in this case, because, upon a careful examination of the evidence, we think it does not lay a foundation for a rehearing.

We remark that the affidavits are generally written by counsel, and are more strongly expressed than the depositions of the same witnesses used upon the hearing.   Such evidence is less satisfactory than if taken by a disinterested person.   As affidavits thus taken

can not be used upon a rehearing, this mode of taking the evidence is attended with delay, expense and labor, both for the court and counsel. The testimony is to be twice taken and twice considered. We think, therefore, it would be a reasonable and judicious course, in such cases, to apply to the court or a judge for an order that the evidence should be taken before a commissioner, upon notice, as depositions, and that it may be used upon the rehearing.

The new evidence is much of it from the same witnesses whose testimony was used at the hearing, but additional statements of particular facts are found, designed to give weight to the opinions, which, in the case of unprofessional witnesses, would pass for little without them.

All the facts presented in the affidavits are analyzed and grouped in the able opinion of Dr. Bancroft in his affidavit; and they seem to us to have, to a great extent, the weight he has assigned to them. His examination of the evidence, which he justly characterizes as being often vague and as presenting but a small number of facts, and, we may add, those facts not often bearing very directly upon the time of the execution of this deed, seems to us, in the main, fair and reasonable. He infers from the symptoms of bodily disease, commencing fifteen or twenty years before Mr. Dennett's death, and progressing steadily to a fatal termination, that he was affected by disease of the brain. He states the opinion that from such disease of that organ there is great probability that the mind must be impaired; and he then brings together the particular facts stated by the witnesses relative to his condition of mind, and draws from them the conclusion that Mark Dennett's mind was seriously impaired by the disease under which he suffered.

In this conclusion we can readily agree with Dr. Bancroft; and we notice but few particulars in his discussion of the evidence which are not satisfactory. He leaves out of the account the evidence relative to the intemperate habits of Mr. Dennett, which, if too slight to have produced or aggravated the symptoms of disease, yet might have a very important bearing upon some of the facts testified by the witnesses, indicating derangement of the mind. The strange statement Mr. Dennett is said to have made, that he was the most perfect man, &c., would not be so strange in the mouth of a drunken man. Dr. Bancroft perhaps regarded the evidence on this point as too slightly connected with the proof of that statement to deserve great consideration.

Some weight is attached to the evidence that the character of Mr. Dennett changed after his first attack of illness. From being enterprising and prosperous he became remiss, made bad bargains, did not look sharply after his interest, and managed his farm badly, and that he was childish and pleased with trifles. As such changes of character are seen to result from various causes, independent of insanity, as from general ill health, from want of success and consequent discouragement, from domestic troubles, from intemperance, and from indolence, we should perhaps attribute less weight to this evidence than Dr. Bancroft seems to have done.

But Dr. Bancroft's conclusions do not reach the material point in

this case.    The powers of the mind may be impaired in various ways and in various degrees.    It is not every degree of mental disease or derangement that destroys the legal capacity to dispose of property.    *Re Morgan*, 7 Paige 237.    Such derangement may vary through an infinite number of degrees, from eccentricity or dullness to furious madness or utter imbecility.    Shelf. Lun. 37.    In the closing remark of Dr. Bancroft's affidavit he expresses the opinion that Mark Dennett was in a state of *dementia* during the latter years of his life, produced by disease of the brain.    The affidavit contains little, either of fact or argument, tending the show a state of *dementia*, if we understand that term to express such complete prostration of the mental powers as to render the sufferer incapable of transacting business; and we must therefore understand the term *dementia*, as here used, as indicating an impaired state of the mental powers, a feebleness of mind caused by disease, and not accompanied by delusion or uncontrollable impulse, without defining the degree of incapacity.    Such feebleness or impaired condition it seems the whole drift of the previous parts of the deposition to show.

We have not been able to discover that any line is drawn by medical experts between weakness of mind and *dementia;* and we trace no indication of such line drawn with any reference to the capacity to transact business.    Indeed, it seems not an uncommon opinion of medical men and others, that if insanity is clearly proved to exist in any degree, the party can no longer be safely regarded as capable of transacting any business.    Wh. & St. Med. Jur. 20 ; *Waring* v. *Waring*, 6 Moore P. C. 349.    We are unable to adopt this opinion, because we think there is abundant evidence that the species of insanity called *monomania* may be limited to certain subjects; as, for instance, to the health of the sufferer, without sensibly affecting the general capacity in other respects; Wh. & St. Med. Jur., sec. 42 ; and that the mind and memory may be greatly impaired, and yet the person be capable of disposing of property, where there has been no fraud or undue influence.

In former times it was held — and that seems to be the received doctrine in some courts quite recently — that "*non compos mentis*" is one "that by sickness, grief, or other accident, *wholly* loseth his understanding" ; Beverly's Case, 4 Co. 123 ; Co. Litt. 247, a ; that "the terms *non compos mentis*, of unsound mind, are legal terms, and import a *total* deprivation of sense" ; 2 Mad. Ch. 727 ; and that to invalidate a deed it must be shown that the grantor was *non compos mentis* within the legal acceptation of the term ; that it was not a partial but an entire loss of the understanding ; for the common law seemed not to have drawn any discriminating line by which to determine how great must be the imbecility of mind to render a contract void, or how much intellect must remain to uphold it.    *Jackson* v. *King*, 4 Cow. 216 ; *Blanchard* v. *Nestle*, 4 Denio 41.

This view of the law we do not understand to prevail here, but the truth is held to lie between these extremes.    Every person is to be deemed of unsound mind who has lost his memory and understanding, by old age, sickness, or other accident, so as to render him incapable of transacting his business and of managing his property.

*Re Baker*, 2 Johns. Ch. 232; see 1 Paige 173; 21 Vt. 170. When it appears that a grantor had not strength of mind and reason to understand the nature and consequences of his act in making a deed, it may be avoided on the ground of insanity. *Davies* v. *Grindley*, Shelf. Lun. 266. A man, by the bare execution of an instrument, does not make it his deed, if at the time he was so weak in mind as to be incapable of understanding it if explained to him. *Mannin* v. *Ball*, 1 Sm. & Batt. 185; S. C., 1 Dow P. C. (N. S.) 381; 1 Bligh. N. S. 1. All that the law requires to make a deed effectual is that a man should have possession of his reason, so as to know the effect of the act he is about to perform, and to be capable of carrying that act into effect. *Creagh* v. *Blood*, 2 Jones & Lat. 509.

The question, then, in all cases where incapacity to contract, from defect of mind, is alleged, is not whether a person's mind is impaired, nor if he is afflicted by any form of insanity, but whether the powers of his mind have been so far affected by his disease as to render him incapable of transacting business like that in question. An impaired condition of the mental powers, such as may be inferred by the medical expert, may constitute mere weakness of mind, or a complete prostration of the faculties. Wh. & St. Med. Jur., sec. 74. In the last case there may be no delusive impression, nor false assumption of fact, nor confused hurry of mind, nor uncontrollable impulses, such as characterize ordinary insanity; but the mind is inert, the memory is unable to recall and the mind to retain in one view all the facts upon which the judgment is to be formed for so long a time as may be required for their due consideration. *Converse* v. *Converse*, 21 Vt. 168. Such weakness may be the sudden result of disease, as in cases of paralysis, but is generally more or less gradual in its approach, scarcely perceptible at first, and becoming more apparent with the lapse of time and increasing disease. No marked line can be drawn at which weakness of mind becomes so great that the party ceases to be capable of binding himself by his contract or conveyance. The judicial investigations of insanity are therefore for the most part confined to the inquiry, whether such a state of insanity exists as actually disqualifies the person from conducting himself consistently with the personal safety of himself and others, or from managing and disposing of his own affairs and property.

Weakness of understanding is not of itself any objection to the validity of a contract, if the capacity remains to see things in their true relations, and to form correct conclusions. If a man be legally *compos mentis*, he is the disposer of his own property, and his will stands for the reason of his actions. *Ormond* v. *Fitzroy*, 3 P. W. 129; Shelf. Lun. 37. But it is held that though weakness of understanding is insufficient to avoid a deed, it furnishes ground of suspicion of improper influence, and therefore, wherever fraud can be inferred from the circumstances of the transaction, equity will interpose to relieve against it. *Jackson* v. *King*, 4 Cow. 216.

The doubtful and uncertain point at which the disposing mind disappears and where incapacity begins, can be ascertained only by an examination of the particular circumstances of each case, to be

duly weighed and considered by the court or jury; and in determining the question the common sense and good judgment of the tribunal must be mainly relied on.

As the law presumes every man to be sane — *Pettes* v. *Bingham,* 10 N. H. 514 — the burden of proof is on the party who asserts the want of capacity; and we think the evidence, giving all due weight to the medical testimony, falls short of showing incapacity. It appears that Mr. Dennett was the owner of a farm and the head of a family. During the whole time embraced in the evidence till the deed in question, there is nothing to show that, in the intervals of the attacks of his disease, he did not transact all the business naturally to be done by one so situated. There is no evidence that his business was done by others, or that he had any difficulty in transacting his business because of any suspicion of insanity or incapacity; and with the exception of what is said in regard to his sales of timber, there is no evidence that his bargains are those of an insane, foolish or broken down man. When we look at the evidence produced, in comparison with what must necessarily exist if the defendant's positions are correct, we can hardly doubt that though Mr. Dennett's powers were impaired, he had still capacity for the transaction of ordinary business.

The evidence tending to raise a suspicion of fraud or imposition upon a man of enfeebled intellect, which is a fact to be proved by him who asserts it, is quite too slight to justify a rehearing.

*Petition dismissed.*