JOHN B. PENINGTON, Attorney General of the State of Dela-
ware, on behalf of JOHN THOMPSON, an Insane Person,
at and by the relation of CHARLES JONES and JOSEPHINE,
his Wife, and THOMAS J. HORN and LEE, his Wife, and
CLARA THOMPSON, and also the said JOHN THOMPSON,

*vs.*

WILLIAM H. THOMPSON and JANE M. THOMPSON.

New Castle, Sept. T. 1880.

*Persons of unsound mind ; resort to equity to annul deed made
by ; practice.*

1. Where a person of unsound mind, not found so by inquisition, con-
veys his land by deed to another, the proper mode of proceeding in
equity to have such deed canceled, annulled and made void is not
by information exhibited by the attorney general on the relation of
others, but by bill in the name of the incompetent person by a re-
sponsible next friend.

2. For the purpose of annulling such deed by a decree in equity, it is not
necessary that such incompetent person shall have been previously
found insane upon inquisition.

3. In such case the court of chancery does not act under its statutory
authority to appoint a trustee to take care of the person and manage
the estate of the insane person, but in the exercise of its inherent
and original power to declare such a conveyance void and of no
effect.

INFORMATION BY THE ATTORNEY GENERAL TO SET ASIDE A
DEED MADE BY A PERSON OF UNSOUND MIND. *On motion to
dismiss the information.*

The information exhibited in this cause states that John
Thompson and his wife on the 17th day of June, 1876, exe-
cuted under their hands and seals a paper in the form of an
indenture of bargain and sale, and purporting to be for the
consideration of $5,000, to convey unto William H. Thomp-
son and Jane M. Thompson, the defendants, as tenants in
common, in fee simple, certain lands in the information
described ; that such alleged consideration was wholly inade-

·quate, and was in fact never paid; and that the premises so ·conveyed were worth the sum of $40,000.

The information also states that the said John Thompson is in the eightieth year of his age, much enfeebled in mind and body by reason of age and other causes; that some years since he was severely injured in the head by an accident which deprived him of consciousness; that he has never recovered from the physical effects of the said accident; that it is believed his brain received from it a permanent injury. The information also states that the said Thompson, for about four years past, has been subject at times to mental aberrations wholly unfitting him for the management of himself, and requiring the care and control of his family; that for many years at all times he has been of feeble mental capacity, and wholly incapable of managing his own affairs, or of transacting any serious business without guidance; and that for many years prior to the year 1876, in consequence of his mental incapacity, he has not transacted business for himself or interfered with the management of his property by his son, the said William H. Thompson, but has been treated by his family as incapable of attending to his business affairs, and the same, together with his property, have been under the absolute and irresponsible management of his son. The information further states that the said John Thompson has not been, for the period of four years, of a sound and disposing mind, such ·as to enable him to make a legal disposal of his property even were he not under any undue influence; and charges that during all the said period the said John Thompson has been, and ·still is, in mind, so far under the influence and control of his ·said son as to be wholly incapable of resisting his said son's will or desire in any business transaction, or of exercising an independent will or judgment in any matter in which his said ·son's interests or wishes were concerned. The said John Thompson has other children with whom his relations have ·always been friendly, and by his deed to the defendants he ·conveyed to them absolutely all his real estate. The information, among other things, prays "that the said pretended

indenture of bargain and sale from the said John Thompson and Ann, his wife, to the said defendants, may be vacated, annulled, declared to be void, and absolutely set aside ;" and that in the mean time the defendants be restrained from selling, conveying, incumbering or disposing of the said real estate and premises or any part thereof, or in any way injuring the same, until the further order of the court.

Upon exhibiting the information the preliminary injunction, as prayed, was awarded.

At the hearing the solicitor for the defendants moved that the injunction be dissolved and the information dismissed.

*W. G. Whiteley*, for defendants, for the motion to dismiss :

There is no statute in this State giving the power or authority to the attorney general to file an information on behalf of a lunatic ; nor has there ever been any practice of the kind or a single case in our whole judicial history. If there is such power or authority it must be derived from the practice of the Court of Chancery in England.

But in England the jurisdiction over idiots and lunatics was not within the general jurisdiction or powers of the Court of Chancery, but was a personal trust in the Lord Chancellor, especially delegated to each Lord Chancellor by a letter missive from the King.

It was not always delegated to the chancellor, but was generally so for convenience ; there are instances where it was given to the Lords Commissioners. The reason of this especial commission being necessary is that, prior to the Statute of 7 Edw. II., the custody of the person and property of idiots and lunatics was in the Lord of the Fee ; but by this statute the custody of such persons was given to the King, and in case of idiots the profits of their lands during their lives was given him, and in case of lunatics he was made their trustee.

In matters over which the Court of Chancery had general jurisdiction, an appeal was taken to the House of Lords ; but in case of idiots, etc., if there was an appeal, it was taken

immediately to the King; this shows that care of idiots was not in general jurisdiction. 2 Story, Eq. Jur. §§ 1335, 1336, notes; Stock, Non Comp. p. 79, 15 Law Lib.; *Sheldon* v. *Fortescue,* 3 P. Wms. 104; *Sherwood* v. *Sanderson,* 19 Ves. 285; 2 Madd. 723.

The practice in England, in a case where a man was supposed to be a lunatic and there was thought to be a necessity for someone to take the custody of him and his property, was not to proceed by or through the attorney general on his behalf, but to apply for the writ *de lunatico inquirendo,* and upon the commission finding him incapable of his own government, etc., to appoint a trustee, who had not only the care of the person, but who brought all suits for him, or on his behalf—to set aside deeds made during lunacy, as well as others.

The attorney general in England could only (and was only called on to) file an information on behalf of a lunatic where there had been a commission but no trustee had been appointed, or where the interests of the trustee and the lunatic were supposed to clash. 1 Dan. Ch. Pr. p. 8, note 1; Id. 107; Story, Eq. Pl. §§ 64, 65; Mitf. Pl. pp. 30–32; Stock, Non Comp. p. 32; *Re Scott,* 3 Legal Obs. 164; *Palmer* v. *Woolrich,* 1 Ch. Cas. 153; *Palmer* v. *Parkhust,* Id. 113; *Ridler* v. *Ridler,* 1 Eq. Cas. Abr. 279; *Ortley* v. *Messere,* 7 Johns. Ch. 139.

If such was the English law and practice—and we have no statute authorizing it—the attorney general cannot here in the first instance (and without a commission first having issued) file an information on behalf of an idiot.

The powers granted to our court of chancery were only the general powers of the court in England. 1 Del. Laws.

Among the first Acts passed by our State Legislature, after the adoption of our first State Constitution in 1792, was our present Act in reference to the case of insane, idiots, etc. This Act was passed within eight months after the adoption of the Constitution, which is negative proof that without it there was no one—attorney general nor anyone else—to take care of them or their rights. 2 Del. Laws.

The proceeding in this case should have been initiated by "writ of lunacy," and if John Thompson had been found a lunatic, a trustee should have been appointed who could have brought suit to set aside the deed referred to in the information.

The trustee so appointed is the only legal person who in this State could bring such a suit to preserve and protect the property. See Act.

The language of the warrant or writ directs the jury to inquire, *inter alia*, "from what time he has been insane, and if the said A B, being in the same condition, hath alienated any lands or tenements, and what lands and tenements." The plain inference from this being that had he done so— alienated any lands, being of unsound mind—such alienation would be void, and that the trustee would be directed to take proceedings to recover them. This is the course which the relators should have adopted in this case.

There are but very few cases in England where an information has been filed by the attorney general in cases of idiocy, etc., showing that there were but few peculiar circumstances and situations which permitted it; and the text writers, such as Stock, Mitford and Story, were correct when they limited such interference to such cases as where there had been a commission, but no trustee, or where the interest of the trustee would clash with that of the lunatic.

Jurisdiction cannot be given to a court of chancery by any supposed or absolute necessity for an immediate remedy in such cases as the one on trial, nor from any supposed danger of the grantees selling, as claimed by complainant. The court's jurisdiction is limited to the general jurisdiction of Courts of Equity in England and statute authority; none other can be assumed or "roped in" to sustain a case. Especially is this so when our laws provide a remedy, viz.: "The writ of lunacy."

The disposal by a lunatic of his property during lunacy is not of such a "public" importance as to call for the interference of the attorney general—there being no law author-

izing such interference, but there being in fact a remedy (writ. of lunacy) provided by law.

The cases given for complainant as instances where informations have been filed in this State by the attorney general,. —to wit: charities, and the suppression of lottery, stand upon different grounds. " Charities" is on the ground of the general jurisdiction of the Court of Chancery in England, and in the case of lotteries the State has an undoubted right o inquire by its law officer if its own grant of legislative authority to draw lotteries is being abused. These are matters of general public importance. The conveying of real estate to two of five children is not of any public concern,—a mere private affair.

To sustain this information there should have been some authorities shown and produced to the court, either from England or from our own State. There was none from England and none in our State. It is their business and duty to show this. It will not do to say they are suing under the " ordinary general jurisdiction of a court of equity." What has the attorney general to do with the " ordinary jurisdiction " of a court of equity? If this information can be sustained upon this ground, it is enlarging the power of an attorney general to an unlimited extent. There would be scarcely a conceivable case in which he could not interfere. The plain answer to this assumption of jurisdiction is that, until the question of lunacy is determined and fixed in the mode pointed out by law, neither the court nor the attorney general nor anyone else has anything to do with the matter. The chancellor's right, or rather the power of a court of chancery, does not begin until this question of lunacy is determined. Where there had been a commission under the statute, and the man found *compos*, would the chancellor, nevertheless, entertain a bill by attorney general or anyone else to set the deed aside? The court would consider the finding of the jury as conclusive.

This is a case where the attorney general is not a proper party ; and such being the case, the chancellor cannot retain

the information and direct an issue, nor can he order a writ of lunacy. This is not the case where those filing the bill are proper parties, but not all of those interested,—where, upon the objection being made the chancellor would retain the bill, and direct the making or adding of the new interested parties; nor can he direct the writ of lunacy, as the statute points out how it shall be initiated.

The objection made by defendants is vital to the character of the bill, and can therefore be made at the hearing, and if vital cannot be granted on terms—such as paying the costs. They have not presented a case in which the chancellor has jurisdiction. The information cannot be amended in the particular of parties. No one can be joined with the attorney general,—if he can sue, he sues alone,—and therefore it follows, if they have misconceived their remedy, they must not only have their information dismissed, but are answerable for all the costs of the case.

*D. M. Bates*, with whom was *George H. Bates*, for complainant, in opposition to the motion to dismiss:

I. This is not a proceeding under that branch of the jurisdiction of the court which concerns the case of idiots and lunatics and the administration of their estates pursuant to our statute. That is what is commonly called a proceeding in lunacy.

This is a suit addressed to the general equity jurisdiction of the court, for the redress of a wrong to John Thompson, —differing nothing as to the jurisdiction invoked from any ordinary suit in equity,—differing only in the circumstance that Thompson being not mentally competent to sue, it is necessary that another should represent him. And, according to settled principles and practice in England and in this State, his proper representative (in the absence of a trustee) is the attorney general.

There are two distinct procedures in which insane persons are protected by law, viz.: 1. Where some special wrong is to be redressed or right asserted. This is done by the ordi-·

nary legal remedies, either at law or in equity,—the same remedies, under the same proceedings and with the same effect as when taken by any other person, except that the personal disability of this class to act for themselves raises the necessity of a representative. 2. Over and above this, is a special protection given to them by bringing them, through proper proceedings, under the guardianship of the court through a trustee.

(This is that special administrative jurisdiction, the origin of which in the English Chancellor is so much discussed, but which, as will be more fully stated presently, has no relevancy to this case. The precise character of the jurisdiction in proceedings in lunacy will be stated at the close, but not here, because of its irrelevancy.)

II. Treating this, then, as a case addressing itself to the ordinary equity jurisdiction of the court for relief, the precise objection is that an information by the attorney general is admissible only in behalf of one who has been found a lunatic under a commission, and who has no committee, or whose committee, if there be one, is adverse in interest; that for wrong done to one actually incompetent there is no remedy prior to a commission, nor, by necessary consequence, after a commission, if the jury fail to find him a *non compos*.

This objection must rest on one of two assumptions: (1) that a court can judicially recognize as incompetent, and admit to be represented as such in a suit, only one found a lunatic by inquisition ; that it is such finding that gives him, so to speak, a status as an incompetent person to sue or defend by a representation ; or (2) that the fact of incompetency as one of the grounds of relief in the particular suit can be established only by the finding of an inquisition in lunacy.

Let us consider these in order :

Supposing the person actually incompetent, though without any inquisition finding him such, entitled to relief by suit and to be represented by some competent party; then we hold that the attorney general is authorized to represent him as well before as after an inquisition, his authority to do so after not being controverted.

1. As to the necessity of a finding under a commission to give the party a status to be represented as an insane or incompetent person in the particular suit.

The right of an insane person to legal redress in any proper case, and consequently the authority and duty of a court to entertain a suit on his behalf, by a proper representative, cannot be dependent on the previous finding of him insane under a commission. That would work a failure of justice.

The court, therefore, will by any proper proceeding interfere to avoid the acts of a person actually incompetent, or to afford him any sort of protection or redress by suit, although before inquest found, or even though, as in some special cases, there might not be sufficient to warrant a commission in lunacy. The commission is necessary to invest the court with the care and disposal of the person and property of the lunatic, but it is not a prerequisite to the jurisdiction to protect him against fraud or imposition of others.

In *Owings' Case*, 1 Bland, Ch. 290, the precise point now considered was adjudicated by *Chancellor* Bland with much care. That was a bill filed by Rebecca Owings and John Cromwell and wife, against William Owings, to recover an annuity under a will of her father. Cromwell and wife had the care of Rebecca's person under her mother's will. They joined her in the suit. There had not been any proceeding in lunacy. Cromwell and wife had no interest. The chancellor says: " Generally and technically speaking, those only are called lunatics who have been so found and returned. Without an inquest and return thereon, no one can be judicially treated as a lunatic, and be debarred of his liberty or have the management of his property taken from him. The power to devest a citizen of his personal freedom and of his property is one of a most extraordinary and delicate nature, and should therefore never be exercised without observing every precaution required by the law. But although this court will, in no case, undertake to go all lengths, and to confine or dispose of the person of anyone as a lunatic, until he has upon solemn inquisition been found to be *non compos*

*mentis*, yet it will grant relief and protection to such persons without and previous to their being adjudged to be *non compos*. On a proper application, the granting of a writ *de lunatico inquirendo* is generally a matter of course; but still it is discretionary. If the chancellor sees that the interests of the subject of it may be promoted or his health benefited by withholding or suspending it, he may do so. The object of the chancellor's authority in matters of lunacy is to protect and take care of citizens who are intellectually unfortunate; hence, it has been always so exercised as most effectually to attain that object. If the execution of a commission of lunacy would in all probability have a tendency to confirm the lunatic in his insanity, or if his estate or income is too small to defray the expense of its execution, or if the object in view may be attained as safely and as fully in all respects without it, the execution of the inquisition may be suspended, or dispensed with altogether. In short, there are many instances in which the court will recognize and act upon the fact that a person is in a partial or complete state of insanity, without requiring that fact to be established by a return to a writ *de lunatico inquirendo*. I am of opinion that this may be considered as one of those instances . . . I shall therefore proceed without requiring R. to be formally declared a lunatic and a committee of her person and estate to be appointed."

These views of *Chancellor* Bland are supported by several considerations, viz.:

(*a*) The jurisdiction to relieve by suit and the right of the insane to be so relieved is a general one, such as would have existed had there never been any special or statutory jurisdiction for the appointment of trustees, etc. This general jurisdiction is in its nature distinct from and independent of the special or statutory jurisdiction. It cannot be held dependent on the latter unless it were by law expressly made so. Were there a provision in our statute that no suit on behalf of a person, though actually insane, should be entertained until after a commission, then by such a provision

the general jurisdiction of the court to relieve would be limited, but not otherwise.

(*b*) The two proceedings are for two distinct objects, having no connection or dependence between them ; that is, the suit is to afford redress for some past transaction, and spends itself on that. It is an exercise of the court's general jurisdiction for redress by suit.

The commission looks to the future care and protection of the insane person and administration of his estate. This is under a special, and in our State at present a statutory, jurisdiction.

If it were true that legal redress for particular rights or wrongs could be given to a person insane only by the court as his statutory guardian, then there would be ground to argue that no suit can be brought for an insane person until after commission, etc. But the contrary is true, that it is in the exercise of its general equity jurisdiction and in the form of a suit, as in all other cases, that the court gives legal redress to the person insane, even after he is found insane under a commission. In the absence of any restriction by law the same general jurisdiction must be operative and effectual before commission as well as after.

(*c*) There is no law, practice, or reason for the courts to deny redress by the ordinary legal remedies to a person insane in fact, until he is found so under a commission. Such a position would to a large extent work a failure of justice. For, in the interval before the finding under a commission, the opportunity to secure debts or to recover property, or to prevent waste or other injuries by injunction, or to prevent the loss of testimony by suing promptly, might be lost, or other like injuries sustained. And on this theory, if a jury should erroneously fail to find insane a person who is in fact so, he would be wholly remediless,—not being competent to sue himself, having no trustee to sue, and, as is here contended, neither the attorney general nor anyone else being authorized to represent him. This risk of his suffering loss of rights by delay would be increased in a case (such as this) where the

party against whom the redress is to be sought stands in such relation—say the eldest son and controlling member of the family—that he is interested to delay or baffle the result of a commission.

This consideration receives the greater force from the fact that a commission in lunacy, though ordinarily granted, is nevertheless discretionary with the chancellor even though incompetency of the party to manage his business is known to exist; as, where the personal comfort and health of the party would be best promoted and his interests sufficiently cared for without it, or where it would impose needless expense on a small estate. This is fully stated by *Chancellor* Bland in *Owings' Case*, 1 Bland, Ch. 294, and is supported by a number of authorities there cited. *Lord Chancellor* Erskine, in *Ex parte Cranmer*, 12 Ves. 447, puts other and strong considerations which may restrain the court from granting a commission though the party be actually *non compos*, where it is not absolutely necessary to the relief required. He especially instances the case of senile imbecility.

The only true and safe view is that the court in which the suit is brought will judge whether the party is or is not competent to sue·for himself, and if as a matter of fact he is not competent, allow him to be represented in such manner as the settled practice warrants.

(*d*) Another reason why this form of remedy should not be suspended or held dependent on the result of a commission is that there are cases in which one's condition might not warrant his being found insane under a commission so as to have a trustee appointed, and yet, through weak-mindedness, imposed upon by fraud or undue influence, he may be entitled to protection so far as to have the transaction set aside and to be represented by the attorney general. Such is this case in one of its branches.

This particular mental condition is very well described in *Blackford* v. *Christian*, 1 Knapp, 73, cited fully in Whart. & S. Med. Jur. § 76. There *Lord* Wynford lays down the doctrine, since followed in all the cases, thus : " A

degree of weakness of intellect far below that which would justify such a proceeding (*i. e.*, in lunacy), coupled with other circumstances to show that the weakness, such as it was, had been taken advantage of, will be sufficient to set aside any important deed."

In 1 Story on Equity Jurisprudence, § 238, from a full view of the cases, *Justice* Story draws this conclusion : that " Acts and contracts of persons who are of weak understandings, and who are thereby liable to imposition, will be held void in courts of equity, if the nature of the act or contract justify the conclusion that the party has not exercised a deliberate judgment, but that he has been imposed upon, circumvented, or overcome by cunning or artifice or undue influence." The doctrine thus defined by *Lord* Wynford and *Judge* Story has been expressly approved and followed in many cases which need not now be recited.

In view of all these considerations we put this question : Suppose the chancellor were to dismiss this information, and an application to be then made for a commission ; suppose, then, the chancellor, exercising his undoubted discretion, should, according to the views of *Lord* Erskine in 12 Ves. 447, consider it for the benefit of Thompson not to order a commission ; or suppose a jury should not find him insane ; and suppose, as in fact must appear on this record to the chancellor's satisfaction, that this is a case of great imbecility and shameless imposition,—what remedy will there be ? And suppose, as is the fact, Thompson is incompetent to act for himself, and that under the practice, as it is understood to be, a *non compos* cannot file a bill by next friend,—where will be the remedy ?

2. The second point involved in the objection to filing an information before an inquisition arises from the fact that in this case the mental incompetency of the party in the transaction is a ground of relief, the object being to set aside a deed made in that condition. The question is whether he must be found insane, under a commission, in order to prove his mental incompetency in making the deed, as one of the facts in issue in this case.

The answer is obvious: (*a*) The inquiry under a commission does not go to the party's competency in any particular transaction, but to his general mental condition at the time of the issuing of the commission, and to ascertain additionally how long prior that condition existed. But there is no issue raised, under a commission, as to any particular transaction and all its circumstances, with a view to decide whether it is invalid and to be set aside or not. Such a range of inquiry under a commission would be foreign to its object.

(*b*) The finding of an inquest under a commission either way is conclusive of nothing but the question whether the party shall be put under guardianship for the future. It is not conclusive of the validity of past transactions either way. If he be found by the jury an insane person, that does not conclude anyone who previously dealt with him from proving the contrary. So, if he be found not to be insane, clearly that cannot conclude him as to a past transaction as to which he was in fact incompetent and can be so proved. It is a general principle, applicable as well to inquisitions in lunacy as to other judicial proceedings, that the facts found in it are conclusive only for the purpose of the proceeding in which they are found.

It is true that, for the information of the court in all that concerns the condition and circumstances of the lunatic, the jury is directed to find when the lunacy commenced, and the condition of his property; and, as incident to this, any alienations he may have made; but in any proceeding involving his competency for a particular transaction, his mental condition with reference to that act is open to inquiry. And notwithstanding the inquest may be read in evidence, it is competent to prove, contrary to the finding, the actual mental condition of the party with respect to the particular act drawn into question. Such is explicitly declared to be the law in Shelf. Lun. 64, citing *Sergeson* v. *Sealey*, 2 Atk. 412; *Hall* v. *Warren*, 9 Ves. 609. To the same point are the American cases uniformly. *Re Gangwere's Estate*, 14 Pa. 417; *Hopson* v. *Boyd*, 6 B. Mon. 296; *Den* v. *Clark*, 5 W. Halst. 217;

*Field* v. *Lucas*, 21 Ga. 452 ; *Parker* v. *Davis*, 8 Jones, L. (N. C.) 460.   It seems, therefore, clear that the competency of the party to the transaction controverted in a suit is to be determined by the evidence in that suit, and not by waiting for the chance of an inquisition, a proceeding which, if indeed ever taken, concludes nothing as to the rights of the parties in the suit.

III.  It will be observed that so far the argument has been directed to sustain the right of a person actually incompetent to redress by suit before and independently of an inquisition, and to be represented in the suit.   This right, if sustained, settles the main question, viz.: whether before as well as after an inquisition the attorney general can file an information ; for clearly the right of an incompetent person without a trustee to legal redress is the measure or condition of the attorney general's authority to intervene.   This right and duty to intervene, on proper information by relators, arise wherever a party having a right to be redressed is incompetent to act for himself, except of course an infant who is otherwise provided for by statute.

The principle of his interference is this: that the *parens patriæ*,—which in England is the Crown, here the State,— by its law officer, the attorney general, takes care that justice be done to certain classes, who from their nature or condition at the time are incapable of seeking protection for themselves, such as charities and idiots and lunatics.

This principle is very clearly and aptly stated by *Lord* Redesdale in 1 Bligh, 347, cited in 2 Del. Ch. 464.   He says:   " The King, as *parens patriæ*, has the right, through his proper officers, to call upon the several courts of justice, according to their respective jurisdictions, to see that right is done to his subjects who are incapable to act for themselves, as in the case of charities and other cases."

According to this principle, from time immemorial in England, the attorney general has always by information represented in the courts charities and also idiots and lunatics not having a committee—both on the same principle.   With

respect to idiots and lunatics he has in a number of English cases filed informations. The rule as to his interference is that whenever there is no trustee, or there being a trustee his interest is adverse to that of the party, the attorney general may intervene. Mitf. Eq. Pl. [23]; Shelf. Lun. [416] chap. 10, § 1; Ad. Eq. [301]; Dan. Ch. Pr. 8, 9, 105; Story, Eq. Pl. § 64.

The attorney general has, in frequent cases, filed such informations, and his power to do so has never been questioned. *Leigh* v. *Wood*, cited in Shelf. Lun. 416, from Rep. t. Finch, 135; *Palmer* v. *Parkhust*, 1 Ch. Cas. 112; *Palmer* v. *Woolrich*, Id. 153; *Attorney General* v. *Tiler*, 1 Dick. 378, 2 Eden, 230; *Attorney General* v. *Panther*, 2 Dick. 748, 3 Bro. Ch. 441, 4 Bro. Ch. 409; *Attorney General* v. *Howe*, cited in Mitf. Eq. Pl. 23, note *z; Evans* v. *Blood*, 3 Bro. P. C. 632.

It is not denied that the attorney general is the proper officer to represent insane persons in judicial proceedings; but it is argued that he can do so only in cases arising after inquest by a commission. To this there are two answers:

1. The authorities suggest no such limitation; on the contrary, a critical examination of them will not only support but clearly indicate a different rule. And first it must be remarked that all the other text writers purport to follow Mitford, and refer to him as the authority for their statement of the law on the subject, copying also his citations; but they do not all quote him accurately. His book alone therefore undertakes to lay down originally from the cases the rule of practice. It will be well therefore to examine with some care what he really says. He first states the broad proposition that sometimes informations have been filed by the attorney general on behalf of idiots and lunatics, and he goes on to state the general ground, viz.: "considering them under peculiar protection of the Crown." And afterwards narrowing his remark to the case of a "person found a lunatic" under a commission, he naturally suggests that, even in such a case, if there be no trustee the attorney general may intervene; as if to exclude any doubt whether the general authority of the

attorney general to represent insane persons would extend as well to cases after as before a commission. It might be quite plausibly argued that while the attorney general might interfere before commission as the representative of the authority of the *parens patriæ,* yet after the lunatic had once been brought under the protection of the court by inquisition, the attorney general need not intervene, but may leave the court to provide for his protection by committee or otherwise. Doubtless it is to meet this doubt that *Lord* Redesdale adds to his statement of the general authority of the attorney general what is in effect to say that even in cases where a person has been found a lunatic, but if he has no committee, or if having a committee their interests clash, the attorney general may interfere ; the object being that in no event shall an incompetent person lack such protection. The learned author was a man who did not idly use unnecessary words ; and when in the latter clause he uses the term " a person found a lunatic," it is of course to be inferred that in the previous sentence he refers to persons of unsound mind generally, whether found by a commission or not,—such being then as now the comprehensive meaning of the terms " idiot " and " lunatic " as found in the law books. This construction of the passage is strengthened by what follows : " Persons incapable of acting for themselves, though not idiots or lunatics or infants, have been permitted to sue by their next friend without the intervention of the attorney general,"—which refers to the case of a deaf mute. The language implies that in such cases the attorney general might sue for them, but if they be merely incapable but not actually unsound in mind, a next friend may sue ; in other words, here is recognized the principle that the natural representative to bring suit for any person incapable of acting for himself is the attorney general, but that if the incapacity falls short of mental unsoundness in fact, the next friend as well as the attorney general may bring the suit.

Shelford, a very careful writer, uses substantially the same language as Mitford, making the same distinction between

idiots and lunatics generally and " a person found a lunatic ;" and his treatment of the whole subject bears out the construction given to Mitford.

Turning from the text writers to the cases cited, it will be found that in some of them it appears incidentally that there had been a commission, and others do not show whether there had been one or not. No case expressly states that there had been none, nor would any such negative statement be expected; while if it were a prerequisite to interference by the attorney general we should expect the fact to be always stated. But no case suggests or intimates that it was necessary that a commission should have been issued, nor is the least stress in any case laid upon the matter. It is evidently treated as a wholly immaterial circumstance. It is impossible to believe that if the authority of the attorney general had been subject to such a limitation it should not have been indicated somewhere in such a course of decisions. The case of *Leigh* v. *Wood*, Rep. *t.* Finch, 135, strongly reinforces the views here expressed. The case is so important in its bearing upon the point now under consideration that it is here transcribed in full :

" This bill was filed to be relieved against several actions of trespass brought against the plaintiff by the defendants for entering on a piece of hop-ground which was let by the plaintiff's father to the defendants when (as the bill suggests) his said father was a lunatic at the very time he let this hop-ground, and by consequence was incapable to let it. But the court would not relieve the plaintiff upon this bill, because he had not made the attorney general a party, but ordered him to amend his bill if he thought fit."

This seems to be the earliest case found on the subject. It is scarcely supposable that, if such were the case, the report would not state so material and important a matter, bearing upon the relief sought, as that the father had been found lunatic by inquisition before the lease was granted, so much would this fact have changed the aspect of the case. And again; it is fair to presume that if there had been a commis-

sion, the court would simply have caused the committee to be joined as a party, or, if there was no committee, would have immediately appointed a new committee for the purpose. Such a proceeding would have been natural ; and that it was not done leads to the inference, irresistibly, that there had been no inquest and consequent general control by the court of the affairs of the lunatic.

Under these circumstances the point stands uncontrolled by any authority directly determining it, while the natural inferences all point to the correctness of the view here expressed. It becomes important, therefore, to observe how the matter stands upon principle. This brings us to the second answer to this attempted restriction on the attorney general's power, to intervene, to cases arising after a commission.

2. If (as has been before considered) the insane person, whether so found by commission or not, is entitled to redress in the courts for any right or wrong, then the attorney general becomes his necessary representative, and may file an information ; for—

(*a*) The case is within the principle on which he is held authorized to act at all, viz.: for the protection of those incompetent to act for themselves. This is the principle on which he is authorized to file an information after a commission (as it was admitted he may do). The same principle applies as well to a case before as after a commission. And so clear is this as to impose on counsel the *onus* of showing some direct authority for limiting the action of the attorney general as is attempted.

(*b*) It is in fact far more important that the attorney general should be permitted to intervene in behalf of insane persons mentally incompetent, but who have not been found insane upon inquisition, because after being so found they are already under the protection of the court ; whereas, in the former case they are far more exposed to imposition, against which, upon every consideration of humanity and public policy, it is the duty of the State to lend to them its aid and protection.

(*c*) The suggestion that such an authority in the attorney general, to act before a commission, is liable to abuse, has no foundation whatever. He is the law officer of the State; entrusted with the highest powers; exercising a *quasi* judicial power over most important interests. He acts under oath, and is presumed on all subjects he deals with to exercise, and in fact does exercise in these cases, a cautious discretion. Besides, the whole proceeding from the beginning is under the control of the court. The risk of any abuse of this discretion is not to be compared with the risk of a failure of justice to incompetent persons by leaving them with no one to intervene for them against wrong until, at some future time or perhaps never, a commission may be successfully presented; and such risk is greatly less than to admit such intervention by next friend—a much less responsible agency.

It is considered settled that a bill in equity on behalf of an insane person cannot be filed by next friend, though a suit at law may be so maintained; because then the proceeding by information is inappropriate. *Owings' Case*, 1 Bland, Ch. 290, 293.

IV. In this State the attorney general has the same authority to file an information for the protection of interests incompetent to sue—such as the insane—as he has in England.

This is a part of that remedial power exercised by the Crown or State, through the court of chancery, upon information by the attorney general, for the protection of certain interests which are incapable of self-protection; such, particularly, as charities and idiots and lunatics. The proceeding by information stands on the same grounds with respect to both these classes.

Our court of chancery in the *Potter Will Case*, 2 Del. Ch. 466, on great consideration, entertained an information by the attorney general to establish a trust for charity. That in effect decided that in this State the attorney general may file an information to protect an idiot or lunatic (the decision being also affirmed by the court of errors and appeals)—for

the jurisdiction in the two cases is of the same origin and nature; both spring from the same source, viz.: the duty of the Crown through its proper officer to protect those in courts of justice who cannot act for themselves, viz.: the objects of a charity who are too indefinite to represent themselves, and insane persons who are incompetent.

Now, our attorney general has always been judicially treated as representing the State (as the same officer in England represents the Crown) in all judicial proceedings where the interests or the duties of the State are concerned. In *State* v. *Maury*, 2 Del. Ch. 141, a bill in equity by the attorney general to suppress a lottery was sustained; in *State* v. *Wilmington Bridge Co.* 3 Harrington, 312, he moved for a mandamus; in *State* v. *Wilmington Bridge Co.* 2 Del. Ch. 58, he filed a bill in equity on behalf of the State against a corporation for a discovery and account. And in the *Potter Will Case*, before cited, though his authority was obstinately contested, he was treated as competent to seek, on behalf of the State, the judicial enforcement of a public charity. In the late case of *State* v. *Fleming*, decided in Kent County in 1870, on an information filed by the attorney general for the removal of a trustee of a charity, the authority of the attorney general in this State to file informations was again contested, and again, on consideration of his general official functions, was affirmed.

The argument against the power of an attorney general to represent insane persons is that he can act only for interests of a strictly public nature. It might be sufficient to say that this objection is inconsistent with the admission made that after a commission, if there be no trustee, the attorney general may intervene. But the better answer is that the protection of the incompetent is a public interest. It is one of those objects for which society exists, and is one of the recognized duties of government. And wherever such protection is to be afforded by the courts, and no other means of bringing the objects within judicial cognizance exist, this duty devolves fitly, and with the best guaranty of its proper discharge, on

the law officer of the State. This is the precise principle on which *Lord* Redesdale, in the case in Bligh before referred to as cited in 2 Del. Ch., bases the action of the attorney general in the case of charities, viz. : his duty " to call on the several courts of justice, according to their respective jurisdictions, to see that right is done to his subjects who are incapable to act for themselves." It is not, as here is in effect stated, the paltry pecuniary interest of the State in a charity that gives the attorney general authority to file an information to establish it ; but it is the duty of the State as *parens patriæ* to protect the helpless, which the attorney general in such cases performs. Mitford and all the text-books place the intervention in England for idiots and lunatics on this same ground, viz. (as Mitford expresses it): " considering them under the peculiar protection of the Crown." The methods by which these classes of incompetent interests are protected may differ in different States ; but in this State we have in this, as in our whole judicial administration, closely followed the English practice. And accordingly the settled practice and judicial opinion within the State from the beginning has been to recognize the attorney general as a constitutional officer, charged with the duty of seeking judicial protection for all public interests not having a remedy otherwise ; and, among other interests, with the protection of charities and insane persons, the care and protection of whom in all civilized States—certainly in England and this State alike—are treated, as before stated, as public interests. No method can be devised so appropriate or so safe in its exercise as that which we have here ready furnished from the English Chancery practice, to so large an extent followed by our own.

V. The discussion touching the origin in England of the jurisdiction of the chancellor for the care of lunatics and their estates, exercised by proceedings in lunacy, and touching the nature of his jurisdiction, whether it were a personal delegation from the Crown or were a part of his general equity powers, is wholly irrelevant, because : 1. As before shown this is not a proceeding in lunacy, but a suit within the ordi-

nary equity jurisdiction of the court, such as would have been entertained had the proceeding in lunacy been unknown.    2. The chancellor's jurisdiction over idiots and lunatics in England was in theory a delegation of the Crown's jurisdiction as *parens patriæ*, which invested him with the protection of all interests incompetent for self-protection, including charities, infants, and also idiots and lunatics.    The necessity for a letter missive from the King to the chancellor on his appointment in the case of idiots and lunatics (which was not required as to charities and infants) grew out of the King's having, as to idiots and lunatics, in addition to his relation as *parens patriæ*, a proprietary interest in their lands; that is, in those of idiots absolutely, and in those of lunatics as trustee, subject to their support.    This is fully explained in 2 Story on Equity Jurisprudence, § 1336.    Still, the jurisdiction as to all these incompetent interests found its root in the King's relation as the *parens patriæ*.

But, whatever might have been the theory in England of this chancery jurisdiction over these incompetent interests, in this State it is unquestionably not personal to the chancellor, but inheres in the equity jurisdiction of the court. As applied to charities it was so decided in the *Potter Will Case*, 2 Del. Ch. 46., at close of opinion.  With respect to idiots and lunatics an early statute had vested in the " court of chancery," not the chancellor personally, this special jurisdiction, or perhaps, more correctly, may be said to have recognized it as in the court, and regulated its exercise.    As to infants the Legislature vested the jurisdiction in the orphans' court. The result is that what may be called the prerogative jurisdiction of the English Chancellor has in this State, as to charities, been recognized by judicial decision as vested in the court of chancery ; as to idiots and lunatics, has been vested or recognized by statute in the same court ; as to infants, has been vested in the orphans' court.    To the present suit the inquiry has no relevancy, and is a subject of only historical interest.

It may be noticed in conclusion that, even if it were true

that the finding of Thompson a lunatic by inquisition were necessary to give him a status as an incompetent person so as to make an information effectual, or if it were necessary as evidence of the incompetency as a ground of relief,—the court, having full power as to commissions in lunacy, would order one for the purpose of ascertaining the fact of the lunacy; and in any case the court, having full power of amendment for the purpose of justice, would allow any necessary or proper parties to be made. In the case in Rep. t. Finch, 135, where a bill for relief was filed by the son of one incompetent, the court held that it should have been filed by the attorney general; yet, instead of dismissing the bill, it gave leave to make the attorney general a party.

THE CHANCELLOR.—In the case of *Gorham* v. *Gorham*, 3 Barb. Ch. 24, *Chancellor* Walworth—referring to the cases of *Palmer* v. *Parkhust*, 1 Ch. Cas. 112; *Ortley* v. *Messere*, 7 Johns. Ch. 139; *Palmer* v. *Woolrich*, 1 Ch. Cas. 153; *Fuller* v. *Lance*, Id. 19, and note; *Clerk* v. *Clerk*, 2 Vern. 412; *Addison* v. *Dawson*, 2 Vern. 678; and *Ridler* v. *Ridler*, 1 Eq. Cas. Abr. 279—says: "The result of these several decisions was that where the object of the bill was to set aside the act or deed of the lunatic, upon the ground of his mental incapacity at the time the act was done or the deed was executed, the bill might be filed by the committee or the attorney general alone, or by joining the lunatic with the committee, or with the attorney general when there was no committee, or when the interest of the committee was adverse to that of the lunatic. And the practice in England ever since that time appears to have been either to join the committee with the lunatic in bringing suits for his benefit, or to file the bill in the name of the lunatic by his committee." The words, " by joining the lunatic with the committee, or with the attorney general when there was no committee, or when the interest of the committee was adverse to that of the lunatic," seem to exclude the attorney general from being a party in the cases where lunatics have committees, except when the

interest of the committee may be adverse to that of the luna-
tic, but leave untouched the question whether the attorney
general can be a party in any other case; as, for instance,
where in fact a person may be a lunatic, although not found
such by inquisition. *Lord* Redesdale says: "Idiots and
lunatics sue by the committees of their estates; and where
their interests clash with those of their committees, the attor-
ney general files an information in their behalf." He also
says that the attorney general is the proper person to institute
a suit for one who has been found a lunatic and where no
committee has been appointed ; but the remark suggests the
question whether the attorney general is such proper person
for the want of the committee where one has not been found
to be a lunatic. In fact all the text writers, supported by the
judicial decisions, say that idiots and lunatics must sue in
courts of equity by the committees of their estates, and such
doubtless is the case where committees exist. I shall assume
it as true, as equally settled, that where the fact of lunacy has
been found and no committee of the lunatic has been ap-
pointed the attorney general may file an information in his
behalf.

In the present case John Thompson has not been found
by inquisition an idiot, lunatic, or *non compos mentis*. He
cannot therefore sue by a committee, for he has none. The
attorney general cannot interpose because his interest clashes
with that of his committee, for the like reason that he has no
committee. He cannot interpose because he has no com-
mittee, as for one found to be a lunatic and having no com-
mittee, for he has never been found by inquisition to be a
lunatic. If the attorney general was authorized to exhibit
the information in this cause, it must be for the reason that
he has, by virtue of his office, the power to appear as the
representative of anyone as a lunatic, solely upon the relation
of a third party who chooses to assume the office of relator.
Does such authority exist in the attorney general? No
adjudged case on this precise point has been cited, and I have
been able to find no such case. It is said that the King of

England,. as *parens patriœ*, has the care of idiots and lunatics; and that he is represented in the exercise of this care in chancery by his attorney general; and that this State is to be regarded as sustaining the same relation to this unfortunate class of persons within its limits ; and that in this court, with respect to such persons, the State is represented in like manner by its attorney general.   The immediate question before me is, Can an information on the part of the attorney general at the relation of some of the children of John Thompson be regarded as the proper mode for obtaining the redress sought, namely: a decree declaring the deed from him to his son void ? This question was argued mainly, assuming for the purpose of. the argument that Thompson was a lunatic, or at least a. person incapable of the management of himself and estate, and properly comprehending the nature and character of his acts at the time of the execution of the deed ; it being contended on behalf of the relators that, if such was his situation at that time, an information by the attorney general was the proper mode of procedure, and on the part of the defendants that under the laws of this State the attorney general has no authority to exhibit an information in behalf of a lunatic to annul his acts ; and that, before such acts can be declared void by a decree of this court, it is absolutely necessary that the party should be found a lunatic under an inquisition by proceedings in lunacy.

Mitford (p. 7) says: " A suit to the extraordinary jurisdiction of the Court of Chancery, on behalf of a subject merely, is commenced by preferring a bill, in the nature of a petition, to the Lord Chancellor, Lord Keeper, or Lords Commissioners for the Custody of the Great Seal, or to the King himself in his Court of Chancery in case the person holding the Seal is a party, or the Seal is in the king's hands.   But if the suit is instituted on behalf of the Crown, or of those who partake of its prerogative, or whose rights are under its particular protection as the objects of. a public charity, the matter of complaint is offered to the court by way of information given by the proper officer, and not by way of petition."

The duties of the attorney general in this State are not particularly defined either in the Constitution or the laws, except in a very few instances having no relation to matters similar to that under consideration. It may be assumed, however, that it is his duty to prosecute and defend all suits in the results of which the people of the State are concerned.

On page 24 Mitford says: "Bodies politic and corporate, and all persons of full age not being *feme covert*, idiot, or lunatic, may by themselves alone exhibit a bill." Again: "Those, therefore, who are incapable of exhibiting a bill by themselves alone are (1) infants, (2) married women, except a wife of an exile or of one who has abjured the realm, (3) idiots and lunatics." Again (p. 29) he remarks: "The care and commitment of the persons and estates of idiots and lunatics are the prerogative of the Crown, and are always entrusted to the person holding the Great Seal, by the royal sign manual. By virtue of this authority, upon inquisition finding any person an idiot or a lunatic, grants of the custody of the person and estate of the idiot or lunatic are made to such persons as the Lord Chancellor, or Lord Keeper, or Lords Commissioners for the Custody of the Great Seal for the time being, think proper. Idiots and lunatics, therefore, sue by the committees of their estates."

The cases referred to in support of this last proposition are 1 Ch. Cas. 19, which is found at the bottom of the case of *Fuller* v. *Lance*, relating to a bankrupt; and the whole of which is as follows: "Note, that where committees of a lunatic sue for anything in the right of a lunatic, in such case the committee as well as the lunatic are made parties;" and the case of *Ridler* v. *Ridler*, 1 Eq. Cas. Abr. 379, which was by bill brought by a lunatic and his committee to set aside a settlement which had been obtained from him by the defendant before the issuing of the commission of lunacy, but subsequent to the time wherein, by the commission, he was found to have been a lunatic; the defendant demurred to the bill, because, as he contended, a person should not be admitted to certify himself, for that during the continuance of the lunacy

he cannot be supposed to know what he did. The demurrer was overruled, the Lord Chancellor remarking that the " rule was to be understood, of acts done by the lunatic to the prejudice of others, that he should not be admitted to excuse himself on the pretense of lunacy, but not as to acts done by him to the prejudice of himself; besides, here the committee is likewise plaintiff, and the several charges of lunacy are by him in behalf of the lunatic; and it has been always held that the defendant must answer in that case."

Although idiots and lunatics sue by the committees of their estates, Mitford further remarks that " Sometimes, indeed, informations have been exhibited by the attorney general on behalf both of idiots and lunatics, considering them as under the peculiar protection of the Crown, and particularly if the interests of the committee have clashed with those of the lunatic;" and he refers to the cases of *Palmer* v. *Parkhust*, 1 Ch. Cas. 112 ; *Palmer* v. *Woolrich*, Id. 153 ; and *Attorney General* v. *Panther*, 2 Dick. 748. Does Mitford mean to say that where one has been found a lunatic and has a committee, the attorney general may proceed in his behalf by information? If the committee has a right to sue in behalf of a lunatic, is not the right exclusive? Why in such a case should the attorney general be allowed to proceed by information in his behalf except where the proceedings should be in his behalf against his committee, or where, as Mitford expresses it, " the interests of the committee have clashed with those of the lunatic?"

In the first case cited by Mitford (*Attorney General* v. *Parkhust*, 1 Ch. Cas. 112), although it appears that Smith had been found a lunatic and had lucid intervals, it does not appear whether he had or had not a committee either of his person or estate. If, however, he had a committee—which may have been the case, considering the objection made at the hearing, which was " that in case of a lunatic (where the King hath no interest in his estate, but as *parens patriæ* commits him to another to manage it for him, the lunatic in case he recovers his senses and wits shall have his estate again, and

if not it will go to his administrators) the lunatic himself (as in the case of an infant) ought to have been a party "—we may discover the reason why in that case the proceeding was in the name of the attorney general, from the note in the margin ; which is that generally a lunatic ought to be made a party, but the reason why it was overruled here was that he might stultify himself. We shall hereafter see that this supposed rule, enlarged upon in *Beverley's Case*, 4 Coke, 568, and in the earlier cases in respect to lunatics, has long since been exploded, and has in this relation no existence anywhere.

In the second case cited by Mitford, of *Palmer* v. *Woolrich*, 1 Ch. Cas. 153, the demurrer for that the lunatic was no party was sustained, and a distinction was drawn between that case and the case against Parkhust in this: that to allow the lunatic to have been a party in the latter case would have been to enable him to stultify himself; whereas, no such consequence would result from his being a party in the former case. In the case against Woolrich it is not stated whether the lunatic had a committee, nor that he had been so found by inquisition; but as generally a lunatic is one found to be such, it may be reasonable to presume that the lunatic had a committee. I have not had access to the case referred to in 3 Bro. P. C.

It will thus be seen, in the language of *Chancellor* Walworth in the case of *Gorham* v. *Gorham*, 3 Barb. Ch. 32, that it was not intended in the case of *Palmer* v. *Parkhust*, 1 Ch. Cas. 112, to decide that the attorney general or the committee could file an information or a bill for the benefit of a lunatic in all cases without joining the lunatic himself as a party ; for in the case of *Palmer* v. *Woolrich*, 1 Ch. Cas. 153, which was decided in the next year by the same Lord Keeper, he allowed a demurrer to a bill filed by the attorney general for the benefit of a lunatic, upon the ground that the lunatic was not a party, the bill in that case not being brought for the purpose of avoiding any act done by the lunatic after the loss of his reason. This latter decision was in conformity with

the note at the end of the report of the case of *Fuller* v. *Lance*, 1 Ch. Cas. 19. See also the cases of *Clerk* v. *Clerk*, 2 Vern. 412, and *Addison* v. *Dawson*, Id. 678. The case. of *Ridler* v. *Ridler*, before referred to, to the like effect, was subsequently decided by *Lord Chancellor* King. It will be observed that in none of these cases cited by Mitford was the question raised as to the power of the attorney general to file an information in behalf of the lunatic, but only the question, in those cases where the attorney general was a party, as to whether the lunatic or his committee should also be a party. We do not know as a matter of fact whether the lunatics in those cases had a committee. The reports of the cases are silent in respect to this matter. Upon the supposition that they had such committees, the appearance of the attorney general therein would conflict with the text of Mitford, " that idiots and lunatics sue by the committee of . their estates."

In the case of *Attorney General* v. *Panther*, " the committee of the lunatic, and the executors of her late husband, and who had possessed her property given for her separate use, under a deed executed in her lunacy" (2 Dick. 748, and cited by Mitford (p. 49) as a case in particular where an information was exhibited by the attorney general because the interests of the committee clashed with those of the lunatic), the right of the attorney general to file the bill, although not affirmed or denied, or any question raised in respect thereto, seems to have been recognized, because an issue was directed to say whether the party was a lunatic at the time she executed the appointment under which the executors of her husband claimed. A very good reason may have suggested itself to *Lord Chancellor* Thurlow why the attorney general in that case should have been allowed to file the bill, namely: that the lunatic having been found such, and the proceeding being in part against her committee, she could not be represented by any other party while her committee was continued. I apprehend at the present day, however, under the same circumstances it would be proper to dismiss the com-

mittee and appoint a new one. It is further remarked by Mitford, as we have seen, that such an information has been filed where a person found a lunatic has had no committee, for which he cites the cases of *Attorney General on behalf of Maria Lepine, a lunatic, at the relation of John Fox;* and also *Maria Lepine against Earl and Countess Howe and others,* the name of the reporter not being given. The reason why an information in such case may be filed by the attorney general doubtless is, there being no committee for the lunatic, and the lunacy having been found by inquisition, and the lunatic thereby being made a ward of the court, and under the protection of the State as one incapable of self-protection, the attorney general, representing the State as its law officer, might well see that its protection should be in such a case afforded. It was decided in the case of *Ortley* v. *Messere,* 7 Johns. Ch. 139, that a lunatic is not a necessary party plaintiff with his committee on a bill to set aside an act done by the lunatic under mental imbecility, though it is the general practice to join them, *Chancellor* Kent remarking that "There does not appear to be any use in it, as the committee has the exclusive custody and control of the estate and rights of the lunatic. The lunatic may be considered as a party by his committee; and, like trustees of an insolvent debtor, the committee holds the estate in trust under the direction of this court."

J. S., by inquisition, was, the 23d of June, 1664, found a lunatic with the retrospect of seventeen years; it was likewise found that he assigned a debt sufficiently secured to him for the purchase of a certain manor; and on a bill brought in his behalf by the attorney general, *Justice* Tyrril held that he ought to be relieved; and of the same opinion was the Lord Keeper on a rehearing, and said that it was not necessary that the lunatic should be a party, but gave the defendant leave to traverse the inquisition. 1 Eq. Cas. Abr. 278.

Shelford on Lunacy, 415, says: "Idiots and lunatics must sue in courts of equity by the committees of their estates, and in such suits the committees, as well as the lunatics, should

be parties; and if a lunatic is not named a party in a bill or information in his behalf, it is a good cause of demurrer. Sometimes, indeed, informations have been exhibited by the attorney general on behalf both of idiots and lunatics, considering them as under the peculiar protection of the Crown, and particularly if the interest of the committee has clashed with that of the lunatic." The remarks of *Mr. Justice* Story, in his work on Equity Pleading, § 64, are to the same effect. Indeed, all the text writers follow Mitford. I take it, however, to be settled law, as stated by Story, that in all cases in equity where idiots and lunatics are parties plaintiff, they, having committees, or, as with us, trustees, must sue by the committees or trustees of their estate ; and that there is no exception to this rule unless in cases where the interests of the committee have clashed or may clash with the interests of the idiots or lunatics. No case was cited in the argument of this cause, and I have been able to find none in the modern practice of the Court of Chancery in England or in the practice of the courts of chancery in this country, where it has been distinctly stated that an information by the attorney general was filed in behalf of a lunatic or idiot not found to be such. All the text writers not only follow Mitford, but refer to the same cases to which he refers. These cases I have commented upon, and if any of them be an exception to the general principle stated both by Mitford and Story, " that idiots and lunatics must sue by the committee or committees of their estates," the exception has not been followed or recognized in modern practice.

There is a significant remark, and one which perhaps may be worthy of consideration in the present case, to be found in the case of *Palmer* v. *Woolrich*, 1 Ch. Cas. 153, and it is this : " And the alienation of a *non compos mentis* as well as of an idiot, being found by office, shall be avoided ;" and Shelford on Lunacy, 260, says : " It has been already shown that an inquisition of lunacy is not conclusive as to third parties claiming under instruments previously executed by the lunatic; and the King, before the inquisition, cannot avoid

the alienation of an idiot or lunatic, but afterwards a *scire facias* may be sued out at the suit of the Crown against the person in possession or the alienee of a lunatic's estate, which writ may be traversed."

In England the attorney general, proceeding by information, is a party to the suit; he represents the King. When he proceeds in this State by information he is a party to the suit; he represents the State. In the case of *Attorney General* v. *Ironmongers Co.* 1 Craig & P. 218, counsel appeared for the relator, and the attorney general appeared for another party in interest. The Master of the Rolls said that he could only recognize the counsel for the relator as the counsel for the attorney general, and could hear them only by his permission; that the suit was so entirely under the control of the attorney general that he might desire the court to dismiss the information; and that if he stated that he did not sanction any proceeding, it would be instantly dropped. He held that the attorney general ought not to be allowed to appear for any other party than the informant. In this case the attorney general stated that he did not give his sanction to the scheme of the relators; and an appeal was taken to the Lord Chancellor by the attorney general and the trustees for the charity for which he appeared, when his lordship remarked that on an information the attorney general was a party prosecuting the cause, and was the only party whom the court could recognize in that character, and therefore that his lordship could not hear the attorney general against the relator or the relator against the attorney general. Now, in the present case the relators, it is true, are some of the children of John Thompson, and their husbands; but a relator in such a case need not be a relative if the authority of the attorney general to file the information be solely that which is stated. It is said that the State is *parens patriæ* of idiots and lunatics, as the King is *parens patriæ* of such persons in England. The attorney general in England represents the King in his courts, and if he can file an information there in respect to idiots and lunatics, it is because he represents the *parens patriæ*; and if

he can file an information here in respect to such persons is it
not because he represents the State, which sustains the same
relation in respect to this class of its people? Now, if the King
of England cannot avoid the alienation of a lunatic before the
finding of lunacy by means of an information filed by his
attorney general, can the State of Delaware avoid such an
alienation before lunacy is ascertained by inquisition?

To present concisely and in brief the views I have attempt-
ed to present, I remark: 1. That I consider it settled law
that a person found to be a lunatic, and having a committee
or trustee, properly sues by such committee or trustee; and
that the attorney general cannot be a party by information on
the relation of another or otherwise on behalf of such an one,
unless perhaps in a case where the interests of the committee
and the lunatic clash. 2. No case has been cited in the argu-
ment, and I know of none in the modern practice of the En-
glish Court of Chancery or in this country, where the aliena-
tion of a person alleged to be a lunatic, but not found to be
such, has been decreed to be void upon proceedings under an
information filed by the attorney general upon the relation of
anyone; but it does not follow that such an alienation may
not be declared void in equity in a proceeding by a bill with
proper parties, notwithstanding no inquisition of lunacy may
have been found. 3. Answer may be made in behalf of a
lunatic not found to be such by a guardian appointed by the
the court. If so, why may not a bill be filed in the name of
a lunatic in fact, though not found to be such, by a responsible
party as a next friend?

I have been led to make these remarks, and into this dis-
cussion in respect to the power of the attorney general to file
an information in cases of alleged lunacy and in respect to the
proper parties in cases involving the consideration of lunacy
generally, not because in the view which I take of this case
the consideration of that subject was necessary to its proper
decision, but because the argument of counsel was mainly
directed to these questions. I have listened attentively to the
reading of the depositions in this case, and I am of opinion

that John Thompson was not and is not, in the proper meaning of those terms, a lunatic or an idiot. If he is not a person of sound mind, his mind may be enfeebled or nearly destroyed from old age, bodily infirmity, or other physical causes. Whether such was in fact the state of his mind at the time of the execution of the deed to his son and daughter may not be wholly free from doubt in view of the directly conflicting testimony of the witnesses.

A person who is *non compos mentis* is in the Statute *De Prerogativa Regis* described as one *qui prius habens memoriam et intellectum non fuerit compos mentis suæ.* Lord Coke approved this definition, and in commenting upon it says: " Here Littleton explaineth a man of no sound memory to be *non compos mentis.* Many times, as here it appeareth, the Latin word explaineth the true sense and calleth him not *amens, demens, furiosus, lunaticus, fatuus, stultus,* or the like, for *non compos mentis* is most sure." Imbecility is difficult of precise definition. It is most generally the result of a gradual decline and decay, often attendant upon old age, ill health, or a long course of vicious indulgence. John Thompson, although not totally imbecile, may be such to an extent as authorized him to be classed as one *non compos mentis,* and as such one who might be subject to the statutory jurisdiction of this court. But the interposition of this court under its statutory authority is not invoked, and was not necessary to be invoked, in the present case. In respect of persons of the class to which Thompson may belong, or rather in respect to certain acts done by or in respect to persons of such class, the court of chancery will exercise jurisdiction independent of any given by statute. It is not, however, by reason of the incompetency, but notwithstanding the incompetency, that the court of chancery entertains proceedings in such cases. The prevention of fraud is peculiarly the subject of equity jurisdiction, and the authority to intervene for its prevention, where it is attempted or exists, does not depend upon the question whether the person in respect to whom or in respect to whose rights of property it has been attempted

is or is not of a sound mind. If the deed obtained from Thompson by his son was fraudulently obtained, or if the grantor was mentally incompetent to make the grant, there can be no doubt that power exists in this court so to declare, and by its decree to annul and make of no effect the grant.

In *Re Barker*, 2 Johns. Ch. 232, the status of a person who from old age, sickness, or other cause becomes so weak and incapacitated in mind as to be unable to manage his affairs, and the authority of the court of chancery to award a commission in the nature of a writ *de lunatico inquirendo*, were very fully discussed and ably considered by the chancellor, and the conclusion arrived at was that the authority existed. Formerly it was considered by the English Court of Chancery that the mere imbecility of mind not amounting to lunacy was not sufficient to authorize the court to interfere with the liberty of the subject over his person and property, and in the time of *Lord* Hardwicke it seems to have been understood that there was no specific relief for the case of incapacity from mere weakness of mind. A departure from this strictly technical rule occurred subsequent to the time of *Lord* Hardwicke ; and *Lord* Eldon, in a case reported in 6 Ves. 273, remarked that evidence may support a commission, not of lunacy, but in the nature of a writ *de lunatico inquirendo*, in which he says it must be remembered that it is not necessary to establish lunacy, but it is sufficient that a party is incapable of managing his own affairs. In *Ridgeway* v. *Darwin*, 8 Ves. 65, *Lord* Eldon observed that in *Lord* Hardwicke's time commissions of lunacy were not granted to the extent to which they have been since granted ; and that he found when he came into the court a course of cases establishing its authority where the party was not absolutely insane, but was unable to act with any proper and provident management, and was liable to be robbed by anyone, under that imbecility of mind calling for as much protection as absolute insanity. *Lord* Eldon considered such persons as embraced in that large class of cases mentioned by *Lord* Coke, of persons *non compos* if their understandings had been de-

stroyed by surviving the period that Providence had assigned to the stability of the mind; and in the opinion of *Lord* Erskine the question in such cases was whether the party had become mentally incapable of managing his affairs. *Chancellor* Kent, in *Re Barber*, before referred to, after referring to this change in the practice of the English Court of Chancery, remarks : " I am satisfied that these later decisions are not only founded in good sense and the necessity of the case, but are a sound exposition of the common law which gave to the King as *parens patriæ* the care and custody of all persons who had lost their intellects and become *non compos* or incompetent to take care of themselves. *Beverley's Case*, 4 Coke, 127, 128, 576, 578 ; 1 Bl. Com. 304. All the cases agree that the Statute of 17 Edw. II., committing the care of persons and estates of idiots and lunatics, was not introductory of a new right, but only went to regulate a right pre-existing in the Crown. 4 Coke, 126; Amb. 707; 2 Ves. Jr. 71, 75. I should feel that I had but very imperfectly discharged my trust if I was the means of crippling the jurisdiction of this court by confining it to the strict common-law writ of lunacy. A numerous class of persons whose minds have sunk under the power of disease or the weight of age would in that case be left without protection and liable to become the victims of folly or fraud. This would be a blemish on the jurisprudence of the country."

In *Owings' Case*, 1 Bland, Ch. 290, it was decided that a person who is actually *non compos mentis*, but who has not been found to be so under a writ *de lunatico inquirendo*, may be permitted to sue as a coplaintiff with another who may be treated as his committee and required to give bond to account for any money directed to be paid to him for the use of the lunatic. In this case *Chancellor* Bland remarked: "Generally and technically speaking, those only are called lunatics who have been so found and returned. Without an inquest and return thereon no one can be judicially treated as a lunatic, and be debarred of his liberty or have the management of his property taken from him. The power to devest a citizen of his personal freedom and of his property is one of a most ex-

·traordinary and delicate nature; and should, therefore, never be exercised without observing every precaution required by ·the law. But, although this court will, in no case, undertake ·to go all lengths, and to confine or dispose of the person of any- ·one, as a lunatic, until he has, upon solemn inquisition, ·been found to' be *non compos mentis;* yet it will grant relief and protection to such persons without and previous to their being ·adjudged to be *non compos.* On a proper application, the ·granting of a writ *de lunatico inquirendo* is generally a matter ·of course; but still it is discretionary. If the chancellor sees that the interests of the subject of it may be promoted or his health benefited by withholding or suspending it, he may do so. 'The object of the chancellor's authority in matters of lunacy ·is to protect and take care of citizens who are intellectually unfortunate; hence, it has been always so exercised as most ·effectually to attain that object. If the execution of a com- mission of lunacy would in all probability have a tendency to ·confirm the lunatic in his insanity; or if his estate or income is too small to defray the· expense of its execution; or if the ·object in view may be attained as safely and as fully in all respects without it; the execution of the inquisition may be ·suspended or dispensed with altogether. In short, there are many instances in which the court will recognize and act upon ·the fact that a person is in a partial or complete state of insan- ity, without requiring that fact to be established by a return to ·a writ *de lunatico inquirendo.* I am of opinion that this may be considered as one of those instances." In this case John ·Cromwell and wife were united as coplaintiffs with Rebecca Owings, the person alleged to be a lunatic, and who it appears ·was of unsound mind, although not having previously been ·declared such. The bill was filed to recover an annual sum ·of money given to Rebecca by the will of her father, and the money was decreed to be paid to the said John Cromwell for the use of the said Rebecca—he and his wife being appointed in the decree trustees of her property.

Now, assuming,· for the purposes· of the discussion, that John Thompson, at the time of the· execution of the deed

which is sought to be avoided by this proceeding, was a person whose mind had become worn out from old age, or that his mind had become so enfeebled from old age, bodily infirmity or other causes that he was incapable at that time of comprehending intelligently the nature, character and consequences of the act he was doing, what is the proper mode and who are the proper parties to the necessary proceedings for avoiding his act? Mitford, on page 30, says: "Persons incapable of acting for themselves, though not idiots or lunatics, have been permitted to sue by their next friend without the intervention of the attorney general." On page 54 of the third American edition, in a note, the same remark is made, and it is added that *Chancellor* Thurlow said: "He was not against the practice of finding a man a lunatic who was by the infirmities of age unequal to the management of his affairs. But the more usual course in the English Court is to appoint him a guardian in the receiving and managing his property." In this State where, by Act of the General Assembly, the court of chancery has the care of insane persons above the age of twenty-one years, so far as to appoint trustees to take charge of them and manage their estates; and where the words "insane person" are declared by the Code to include every idiot, *non compos*, and lunatic person,—a commission of lunacy may issue in respect to those persons who have lost their memory and understanding by sickness, grief, or other accident, or by extreme old age, although such persons are not lunatics within the legal meaning of the term, not being persons who sometimes have understanding and sometimes have not. I apprehend, however, that although desirable it is not absolutely necessary that a writ of insanity should issue in respect to such persons, in order that acts done by them may be declared void by a judicial decree. It is true that the writ of insanity when issued commands the sheriff to inquire by a jury not only whether the party is insane, but, if so, from what time he has been insane, and whether during that period he aliened any lands, etc. Yet the universal doctrine now is that the proceedings on the in-

quisition and finding, although evidence, are not conclusive, but may be traversed ; and that any person whose interests are affected thereby may be permitted to prove (when the question of sanity or insanity arises in any proceeding to avoid the acts of the lunatic or insane person) that such person was sane at the time of doing the act, notwithstanding the finding of the inquisition.

The question recurs, how a person in the situation of John Thompson not found to be insane must sue in a court of equity. Shelford on Lunacy, 416, repeats the remark of Mitford hereinbefore cited: that persons incapable of acting for themselves, though not lunatics or infants, have been permitted to sue by their next friend without the intervention of the attorney general. *Beall* v. *Smith*, L. R. 9 Ch. App. Cas. 85, was a suit in chancery by a person of unsound mind, not found so by inquisition, by his next friend. B having become of unsound mind, his family applied to S, his agent, to render accounts. S consulted his solicitors M and P, who in August, 1871, filed a bill in the name of B by a next friend, who was a stranger to the family, against S for an account. A receiver was appointed, and in December, 1871, without notice to the family, the cause was heard as a short cause, and a decree made directing accounts and inquiries. In March, 1872, B was found lunatic, of which M and P had full notice. On the 8th of June, 1872, the chief clerk made his certificate, and on the 29th of June, 1872, the cause was heard on further consideration, and an order made directing the costs of both parties, as between solicitor and client, to be paid out of the moneys in the hands of the receiver. In the accounts of the receiver as passed were also included considerable sums for his poundage and for the employment of an accountant to investigate the books. Some time after the order, on further consideration, a committee was appointed on the lunacy. It was held (varying the order of Wickens, *V. C.*), on petition by the lunatic and his committee, that all the proceedings in the suit after the appointment of a receiver were unauthorized and improper, and that all proceedings after the finding

·on the inquisition were irregular and void, and that M and P must make good to the lunatic's estate the sums paid to the ·accountant and the sums paid to themselves and the defend- ·ant's solicitors for costs (less the costs up to the appointment of the receiver), and must pay the costs of the petition both before the vice-chancellor and the court of appeals, as between ·solicitor and client.

It will be thus seen that the court of appeal, by allowing ·the costs in the cause up to the appointment of a receiver, recognized that a suit by a person of unsound mind, not found ·so by inquisition, by next friend is a suit which may be prop- erly instituted in chancery. Indeed *Sir* W. M. James, in deciding the appeal, remarked : " The law of the court of chancery undoubtedly is that in certain cases where there is ·a person of unsound mind, not found so by inquisition, and ·therefore incapable of invoking the protection of the court, that protection may in proper cases, and if, and so far as may be, necessary and proper, be invoked on his behalf by ·any person as his next friend." Again he remarks : " It is to be borne in mind that unsoundness of mind gives the court ·of chancery no jurisdiction whatever. It is not like infancy in that respect. The court of chancery is by law the guard- ian of infants whom it makes its wards. The court of chan- ·cery is not the curator either of the person or the estate of a person *non compos mentis* whom it does not and cannot make its ward. It is not by reason of the incompetency, but not- withstanding the incompetency, that the court of chancery ·entertains the proceedings. It can no more take upon itself the management or disposition of a lunatic's property than it ·can the management or disposition of the property of a per- ·son abroad or confined to his bed by illness. The court can ·only exercise such equitable jurisdiction as it could under the ·same circumstances have exercised at the suit of the person himself if of sound mind." Then, after stating some cases— ·as, if there be trust property, or in case of partnership—with which the court might deal, he remarks : " And perhaps ·the more common case of its interference is where the incom- petent person by his next friend seeks to set aside instruments

·or other gifts obtained by persons taking fraudulent advantage ·of his mental weakness."

Much was said in the argument in respect to the source of ·the jurisdiction of the court of chancery in England in respect ·of lunatics and idiots. This subject is very briefly but satisfactorily treated of in Snell's Principles of Equity, 3d ed. 353– ·356. The author says : " The jurisdiction extends not only to idiots and lunatics properly so called, but also to all per-.sons who from age or misfortune are incapable of managing their own affairs, and therefore are properly deemed of un-.sound mind or *non compos mentis*. The former is the statutory jurisdiction exercised by the Lord Chancellor and Lord ·Justices in lunacy ; the latter the inherent jurisdiction of the court of chancery, exercised in appropriate cases notwith-;standing the unsoundness of mind, for the protection of the property of the persons so circumstanced." Snell remarks, page ·355, that "The recent case of *Beall* v. *Smith* affords a striking illustration of the several jurisdictions. There the plaintiff having become of unsound mind, a bill was filed in his name by a next friend, for the purpose of winding up the business in which he had been engaged ; a receiver was appointed and ·a decree directing accounts was taken. The plaintiff's family were not consulted in the institution of the suit, and were ·opposed to its further prosecution. Nevertheless an order ·on further consideration was made, and the costs of the suit taxed and paid out of the estate. Pending the suit, application was made in lunacy, and an inquisition having been issued, a committee was appointed of the plaintiff's estate. It having then been discovered that further proceedings had been taken in the suit, a petition was presented by the lunatic and his committee for a declaration that the same were void ; and ·on an appeal to the Lord Justices it was ordered that all pro-·ceedings in the suit, subsequent to the appointment of the receiver, should be set aside, with costs to be paid by the ·plaintiff's solicitor,—the court expressing an opinion that all the proceedings after the inquisition were a gross contempt ·on the jurisdiction in lunacy."

In the present case, if I should be of opinion that John Thompson was incompetent to execute the deed to his son at the time it was executed, and that the present proceeding has been properly instituted, and should grant the prayer of the information, I should do so, not under the statutory jurisdiction of the court of chancery in respect to insane persons to appoint a trustee to have the care of the person and estate of such person, but in the exercise of the "inherent jurisdiction of the court of chancery exercised in appropriate cases, notwithstanding the unsoundness of mind, for the protection of the property of the person so circumstanced." The idea, if it exists, that a person of unsound mind, not found so by inquisition, cannot by a next friend invoke the interference of a court of chancery "to set aside instruments or other gifts obtained by persons taking fraudulent advantage of his mental weakness," must be owing to the old notion on the subject of a person not being permitted to disable or stultify himself. We have already seen that this maxim, at one time so fixedly adhered to, is no longer adhered to—to the extent that it once was. "The true and only rational exposition," says Story (1 Story, Eq. § 226),"of the maxim—which has been adopted by courts of equity—is that the maxim is to be understood of acts done by the lunatic in prejudice of others, as to which he shall not be permitted to excuse himself from civil responsibility on the pretense of lunacy; and it is not to be understood of acts done to the prejudice of himself, for this can have no foundation in reason and natural justice." I presume, also, that the opinion formerly entertained, as it would appear in some of the earlier decisions, that the attorney general must be a party in cases instituted in behalf of persons of unsound mind, and even of lunatics, without joining the lunatic or his committee, was the result of a too strict adherence to this much-boasted but greatly modified maxim. We have already seen, in *Owings' Case*, 1 Bland, Ch. 293, 295, that a lunatic, not so found, may, under circumstances, come in with other persons as coplaintiffs, who may be appointed to receive the relief as her trustees ; and in *Owings' Case*, 1 Bland, Ch. 373,

375, it was decided that the person and property of one in dotage, though not declared a lunatic, may be protected by the court ; and that, too, in the case where the plaintiff alleged in her bill that she was then more than eighty-four years of age, and at a time when she was in a condition of extreme ill health, and altogether deprived of the proper use of her mental faculties, the defendant had fraudulently caused her to execute and deliver a deed which purported to be a conveyance from the plaintiff of all her real and personal estate to the defendant. The suit which had been instituted in the name of the plaintiff, a person in her dotage, having been dismissed by her under the influence of the defendant, it was reinstated and directed to be thenceforth prosecuted by her solicitor for her benefit, and the deed was ordered to be brought into court to be canceled and annulled, and the same was declared to be null and void. I have already quoted at large from the case of *Beall* v. *Smith*, L. R. 9 Ch. App. Cas. 85, which is an authority in point, that a suit by a person of unsound mind, not found so by inquisition, may be brought in chancery by such person by next friend, in which it was remarked by the Lord Justice that the more common case of the interference of the court of chancery in behalf of such persons " is where the incompetent person by his next friend seeks to set aside instruments or other gifts obtained by persons taking fraudulent advantage of his mental weakness."

In *Re Gordon*, L. R. 10 Ch. App. Cas. 192, the statement is : a gentleman made a settlement of nearly the whole of his property in trust for himself for life, and then for four of his five children and their issue. About two years afterward he was found lunatic. A son who took no benefit under the settlement desired to have it impeached, and adduced evidence showing that there was reasonable ground for contending that the settlor was of unsound mind when he executed it. The income of the lunatic was amply sufficient for his wants. It was held that no proceedings ought to be directed at the expense of the lunatic's estate, but that the

excluded son ought to be allowed to file a bill as next friend of the lunatic, without giving security for costs, to impeach the settlement. In this case the solicitors for the excluded son asked that a bill might be filed to set aside the deed, or a bill to perpetuate testimony in respect to the settlor's state of mind at the time of its execution. Their lordships declined to give any directions for trying the validity of the settlement at the expense of the estate, but considered that, as a case was made showing that there was reasonable ground for impeaching it, any person interested in doing so ought to be allowed to impeach it at his own risk, which their lordships considered a more proper mode of proceeding than a bill to perpetuate testimony. Leave was accordingly given to the son to file a bill as next friend of the lunatic, to impeach the settlement; their lordships intimating their opinion that the committee · of the estate must be a formal defendant, but ought not to take any part in the contest. See L. R. 6 Ch. 416.

In the case of *Jones* v. *Lloyd*, L. R. 18 Eq. Cas. 265, a bill was filed by a next friend, on behalf of a person of unsound mind, not found so by inquisition, against the partner in business of the plaintiff, alleging that the plaintiff had for some time past been suffering from softening of the brain, and was of unsound mind, and that it would be for his benefit that the partnership should be dissolved, and praying that the partnership might be dissolved and accounts taken, and the share of the plaintiff in the assets secured for his benefit, and for a receiver. It was held on demurrer that the suit could be maintained, the Master of the Rolls, *Sir* G. Jessel, remarking that he thought such a bill could be filed, and that it was within the authorities. He said: "I take it to be settled law—and when I say I take it to be settled law I am using the very words that were used by the vice-chancellor—that the insane partner has a right to come into this court of course, in a proper case, to have the partnership dissolved. That, then, being his right, can it be exercised? That is, can a suit · be instituted by the lunatic, not found so by inquisition, by

his next friend ?  I have no doubt it can."  The Master of the Rolls, after remarking that there was authority upon the subject, and that it seemed so distinct to him that he had no occasion really to refer to the reason, and after citing the cases of *Light* v. *Light*, 25 Beav. 248, and *Beall* v. *Smith*, L. R. 9 Ch. App. Cas. 85, and the unreported case of *Fisher* v. *Melles*, L. R. 18 Eq. Cas. 268, note, where he said he knew the point was discussed,—did proceed to argue the propriety and necessity from the reason of the thing.  He then proceeded: " But how stands it on authority ?  In the case of *Light* v. *Light* the exact point came before my predecessor, and he decided, in a case of trust, such a bill could be filed by a lunatic not so found by inquisition, by his next friend.  I find in the books of practice the proposition so laid down in the widest sense.  But the question came before the Lord Justices recently in the case of *Beall* v. *Smith*, which was cited to me by the defendants' counsel, and what do they say ? *Lord Justice* James says this : ' The law of the court of chancery undoubtedly is that in certain cases where there is a person of unsound mind, not found so by inquisition, and therefore incapable of invoking the protection of the court, that protection may in proper cases, and if, and so far as may be, necessary and proper, be invoked on his behalf by any person as next friend '," etc.  I have already quoted from the opinion delivered in the case of *Beall* v. *Smith*, and now emphasize that portion of it as particularly applicable to this case, wherein *Lord Justice* James, speaking of the action of the court of chancery, says :  " And perhaps the more common case of its interference is where the incompetent person by his next friend seeks to set aside instruments or other gifts obtained by persons taking fraudulent advantage of his mental weakness."  It will be observed that in none of these cases was it even suggested, either in argument of counsel or in the opinion of the court, that the proceeding should or could be by information by the attorney general.  I consider it unnecessary to load this opinion with a further citation of authorities or to enter into a discussion of the reasons which support them.

The conclusion to which I have come in this case—assuming, for the purpose of the consideration of the question, that John Thompson was a person of unsound mind not found so by inquisition—is that the information exhibited by the attorney general for the purpose of having a decree by this court to cancel, annul, and make void the deed executed by Thompson to his son and daughter, is not a proper proceeding; but that the proper proceeding for such purpose, if said John Thompson was at the time of the execution of said deed a person of unsound mind, not found so by inquisition, would be by bill by said John Thompson by his next friend.

The injunction heretofore awarded in this cause must therefore be dissolved and the information be dismissed, unless the form of proceeding be changed from an information in the name of the attorney general of the State to a bill in the name of John Thompson by his next friend.   [See following case.]